568 A.2d 1

**Kenneth Lloyd COLLINS**

v.

**STATE of Maryland.**

**No. 33, Sept. Term, 1988.**

Court of Appeals of Maryland.

Jan. 10, 1990.

270

Nancy S. Forster, Asst. Public Defender and George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, Gary S. Offutt, Asst. Public Defender, all on brief), Baltimore, for appellant.

Valerie J. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Richard B. Rosenblatt, Cathleen C. Brockmeyer, Asst. Attys. Gen., all on brief) Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL *, JJ.

BLACKWELL, Judge.

Pursuant to the automatic review provisions of Maryland Code (1957, 1987 Repl.Vol., 1988 Cum.Supp.), Article 27, § 414(a), appellant, Kenneth Lloyd Collins (Collins), directly appeals from his convictions of murder in the first degree, use of a handgun in the commission of a felony and robbery with a dangerous or deadly weapon. The jury imposed a sentence of death. We shall affirm both the conviction and the sentence.

## Facts

During the early evening hours on December 7, 1986, Wayne Leander Breeden (Breeden) was brutally and sav-

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

agely shot to death at close range. His body was found on the sidewalk outside a townhouse at 8502 Arry Place in Parkville, Maryland. Breeden was bludgeoned with the butt of a gun during the course of a robbery and was shot after attempting to stagger away from the scene. His death was immediate. The sole motivation for the murder was to take the $80.00 in cash that Breeden had on his person.

Breeden had been in the process of completing several errands. He had first stopped to withdraw money from an automatic teller machine. From there he was to deliver a box of bathroom tiles to Mary and Kenneth Johnson, who rented a townhouse from Breeden at 8514 Arry Place. Finally, he intended to pick up a pizza and return home.

Baltimore County Officer Ronald Kuhns (Kuhns) had been dispatched that evening to Old Harford Road to investigate a call made by a police lieutenant, Richard Koller (Koller). Lieutenant Koller informed Kuhns that he had heard at least two gunshots fired from the direction of Tommy True Court and Arry Place. Officer Kuhns proceeded to the area and was immediately approached by a young man, Timmy Kaufman (Kaufman), who said that someone was hurt and in need of assistance. Kaufman's mother had noticed a man's body lying in front of their residence at 8502 Arry Place. Koller informed Kuhns that he observed a shiny foreign automobile proceed around the rear of the house, "turn around quickly, came back out with its lights off . . ., picked up someone and sped at a high rate of speed southbound on Old Harford Road with its lights off." [1] Koller noticed the very distinct taillights, the vehicle

---

1. Koller testified that he spotted a car, with its lights out, "creeping" very slowly toward Old Harford Road. He continued to observe a black male wearing dark clothes running toward the waiting car. His description stated, "When he approached the vehicle there was some yelling and screaming going on. I can't tell you exactly what the words were, but the gentleman getting in the car was irritated at something. He had difficulty getting into the vehicle."

tag number was NEW–672, and the car was possibly a Toyota.

At the murder scene, police identified the victim's money clip and glasses, which were lying adjacent to the body, as well as a receipt for $80.00 from the automatic teller machine dated 12–7–86. His car was parked in front of 8514 Arry Place. Ceramic tiles were found scattered throughout the grounds. Dirt was found on the front porch of 8510 Arry Place. The flower garden there appeared to be out of order. Human blood substances were found on both the porch railing at 8510 and the sewer cover in front of 8502. A stipulation was entered into evidence that analysis of the substance found on the sewer cover confirmed its identification as human blood, but it could not be typed. There was not enough of the substance on the railing to conduct laboratory analysis.

Dr. John Smialek, Chief Medical Examiner for the State of Maryland, reviewed the autopsy report of Breeden as written by Dr. Gregory Kaufman.[2] The autopsy report revealed the cause of death was a gunshot wound that had entered the right lower back area. A "missile" was recovered from the left side of the front of his abdomen. The pattern of the gunpowder residue on Breeden's skin and jacket indicated that the weapon was held less than six inches from the body when fired. An extensive laceration consistent with "pistol whipping" was found on the right side of Breeden's head. Dr. Smialek classified this head injury as a superficial injury to the outside of the bone of the skull underneath a rectangular laceration. The injury

---

A passing motorist, Jeffrey Gardner, testified that he saw a car on the apartment parking lot being driven with its lights out. The vehicle was approaching very fast and the driver had slammed on the brakes to avoid colliding with his van. The automobile was small and light colored. Mr. Gardner could only observe two black males in the car.

2. Due to the fact Dr. Kaufman accepted a position with the State of New Mexico, Dr. Smialek was asked to provide testimony in the Breeden case. Dr. Kaufman was an assistant medical examiner at the time of the incident.

"would have most likely stunned him. But it would not necessarily have rendered him unconscious. He would have been in all likelihood able to continue after he recovered from the pain of the injury...." There were abrasions to both of the victim's knees. The examiner testified that the body was rolled over while on the ground.

Lieutenant Koller further attested to his investigation following the murder. Koller had drawn a sketch of the unique taillights observed of the foreign vehicle speeding from the scene. On December 8, 1986, he took the diagram to several neighborhood car dealerships. At Nationwide Toyota, Koller spoke with a salesman concerning the diagram. He noticed a Toyota Celica on the lot which matched the shape and size of the car seen the previous evening. After proceeding to the Parkville Police Station to get a camera, Koller returned to Nationwide and spotted a beige Celica with tag number NCS–623. He began photographing the car believing it was the same car observed at the murder scene. Koller gave the photographs to the police and the tags were traced to Tony Michie (Michie).

Michie testified that he would occasionally "hang out" with Collins. In October, 1986, the two had a discussion concerning ways to obtain money illegally. Michie needed money to support a drug habit which included "free base cocaine." Michie had use of a vehicle which could be used for getaway purposes. He was also in default on car payments and was being threatened with repossession. Thus, Michie approached Collins for the purpose of discussing a robbery scheme. Their plans were carried out on December 7, 1986.

Collins retrieved a .38 caliber revolver and a sawed-off rifle. They placed the rifle in a bag and appellant put the handgun in his waistband. According to Michie, the two then proceeded to find a "promising" location for the rob-

bery.[3] After deciding that a restaurant and a hardware store were inappropriate, they decided to follow a car and to rob the occupants. They stopped briefly at a "7–Eleven" store near 33rd Street and Hillen Road. Collins noticed several individuals. withdrawing money from a nearby automatic teller machine. Breeden was followed from the time he used the bank machine until he reached the townhouses on Arry Place. Collins attacked Breeden. They "clenched" and began wrestling. Collins hit Breeden on the top of the head using a "chopping motion." The gun went off shortly thereafter. After Collins frantically returned to the car, he stated, "I only shot him in the butt, so he ain't dead." Michie testified that Collins insisted "he bucked and I had to bust him." This same response was relayed to Collins' sister who observed the wallet and questioned whether she could use the credit cards.

During the course of the homicide investigation, Michie made three statements to the police. On December 10, 1986, he told the detectives that he would speak to them again after consulting with his attorney. Six months later, Michie informed the police that Collins was the triggerman and gave them appellant's name and address. A more detailed written statement implicating Collins was given on November 18, 1987. Michie later agreed to plead guilty to a second degree murder charge and use of a handgun in a crime of violence.[4] Michie gave his third written statement on March 2, 1988 in which he admitted that he had not been completely truthful in his November 18, 1987 statement.

---

**3.** Andrew Thorpe, an acquaintance of Michie, testified that he saw Michie and Collins driving around the city between 5:00 and 6:30 p.m. Michie pulled over to talk with Thorpe and Collins said "we'[re] on a mission." Thorpe understood this statement meant that they were "going to take care of somebody or something." Several days after Michie was arrested, Thorpe spoke with him over the telephone. Michie asked Thorpe to relay a message to Collins indicating that "he wasn't going to take the charge for him." Collins later described the circumstances of the robbery and shooting to Thorpe.

**4.** In exchange for testimony against Collins, Michie and the State agreed that his total maximum sentence would be forty years.

He again, however, implicated Collins as being the trigger-man.

Rodney Bennett, Michie's cousin and roommate, testified concerning a conversation with Michie on December 8, 1986 at approximately 11:00 p.m. Michie told Bennett of the robbery and murder and that homicide detectives were looking for him.

Among other offenses, Collins was charged with first degree murder, use of a handgun in the commission of a felony and robbery with a dangerous or deadly weapon. The State notified appellant of its intention to seek the death penalty on September 21, 1987. Maryland Code (1957, 1987 Repl.Vol., 1988 Cum.Supp.), Article 27, § 412(b). The case was removed from Baltimore County to the Circuit Court for Somerset County on October 27, 1987. *See* Maryland Rule 4–254(b)(1). Collins was convicted of the three charges listed above after a jury trial was held on March 14–24, 1988.[5] The separate sentencing procedure was conducted on May 2, 1988. *See* Art. 27, § 413. The jury sentenced Collins to death.[6]

Appellant immediately filed a motion for new sentence on May 4, 1988. The circuit court later held a hearing on May 27, 1988. The judge denied the motion stating:

> The death penalty verdict in this case was not the consequence of an 'aberrant jury,' the danger against which the Supreme Court sought to protect in the case *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In *Tichnell [v. State]*, 297 Md. [432] 460, 468 A.2d 1 (1983) our Court said 'It is thus clear that the essential principle underlying the varieties of proportional review— is, in short, the guarantee that death sentences will be imposed in a reasonably consistent manner.' Here the

---

**5.** The State nolle prossed the counts charging robbery, attempted robbery with a dangerous or deadly weapon and attempted robbery.

**6.** The trial judge also imposed consecutive twenty year sentences each for robbery with a deadly weapon and the handgun violation.

jury reached the conclusion directed by the legislature in Article 27, Section 414, when it found no mitigating circumstances existed to the felony murder of Wayne Breeden. Thus, the Court finds that the jury's verdict was authorized by the statute and was not disproportionate given the facts of the case. No murder could have been more heinous, more premeditated and deliberate than Breeden's.

This appeal is brought pursuant to the automatic review provisions of Art. 27, § 414(a). *See* Md.Code (1974, 1984 Repl.Vol., 1989 Cum.Supp.), Courts and Judicial Proceedings Article, § 12–307(4).

## I.

### *Prosecutor's Closing Argument*

■ Collins maintains that the prosecutor's comments in closing argument concerning the legal corroboration of the accomplice's testimony constitute reversible error. The disputed rebuttal argument stated:

Mrs. Williams: ... The judge also instructed you that the corroboration, the legal corroboration required, needs only be slight. And that corroboration, ... comes in the form of Jeff Gardner.

Mr. Tayback (defense counsel): Objection.

The Court: What is the objection?

Mr. Tayback: That is a misleading statement as to the corroboration that is necessary to find Mr. Collins guilty in this case.

The following colloquy occurred after counsel approached the bench:

The Court: ... who is Jeff Gardner?

Mrs. Williams: The guy in the van that sees two black males leaving the scene of the crime.

The Court: He corroborated what the man said about Tony [the accomplice] almost hitting the vehicle.

Mrs. Williams: He also provides legal corroboration.

The Court: Yes.

Mr. Tayback: I disagree. When you look at the law on corroboration, it says it must identify the accused with the crime.

Mrs. Williams: It certainly would.

The Court: I am going to overrule the objection.

In *Wilhelm v. State,* 272 Md. 404, 326 A.2d 707 (1974), we noted the general rule that "counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom. . . ." *Id.* at 412, 326 A.2d at 714. This rule has been applied in the context of death penalty appeals.[7] *See Jones v. State,* 310 Md. 569, 580, 530 A.2d 743, 748 (1987); *vacated,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, *remanded* 314 Md. 111, 549 A.2d 17 (1988) (*"Wilhelm* also recognizes that it is 'fundamental to a fair trial that the prosecutor should make no remarks calculated to unfairly prejudice the jury against the defendant.' " Quoting *Reidy v. State,* 8 Md.App. 169, 172, 259 A.2d 66, 67-8 (1969)). The appellate court should not interfere with the trial court's ruling as to the permissible scope of closing argument unless there has been an abuse of discretion of a character likely to have injured the complaining party. *Id.* [272 Md.] at 413, 326 A.2d at 714-15; *see also Esterline v. State,* 105 Md. 629, 637, 66 A. 269, 272 (1907). The *Wilhelm* court set forth tests to be applied in determining whether particular closing argument comments constitute reversible error:

[I]t is unquestionably wrong for the prosecutor in his argument to the jury to refer to any matter not testified to by the witness or disclosed by the evidence in the case. Citing *Toomer v. State,* 112 Md. 285, 76 A. 118 (1910). . . .

---

7. In a death penalty case, we have previously reasoned that it is necessary to consider the disputed closing argument remarks in the context of the remarks as a whole, and with the court's instructions on the law. *See Booth v. State,* 306 Md. 172, 214, 507 A.2d 1098, 1119 (1986), *vacated on other grounds,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987); *Doering v. State,* 313 Md. 384, 388, 412-13, 545 A.2d 1281, 1295-96 (1988).

The Maryland Rule is that unless it appears that the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused by the remarks of the state's attorney, reversal of the conviction on this ground would not be justified. Quoting *Wood v. State*, 192 Md. 643, 65 A.2d 316 (1949); *Holbrook v. State*, 6 Md.App. 265, 250 A.2d 904 (1969).

*Id.*, 272 Md. at 415–16, 326 A.2d at 716. *Wilhelm* also identified three specific factors to be considered. These factors are: 1) the closeness of the case, 2) the centrality of the issue affected by the error, and 3) the steps taken to mitigate the effects of the error. *Id.* (other citations omitted).

 The rule in Maryland that a person accused of a crime may not be convicted based on the uncorroborated testimony of an accomplice is well established. *State v. Faulkner*, 314 Md. 630, 642, 552 A.2d 896, 902 (1989); *Turner v. State*, 294 Md. 640, 642, 452 A.2d 416, 417 (1982). *See, e.g., Brown v. State*, 281 Md. 241, 378 A.2d 1104 (1977); *State v. Foster*, 263 Md. 388, 283 A.2d 411 (1971), *cert. denied*, 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972). This rule has essentially remained unchanged. In *Brown*, *supra*, Chief Judge Murphy reasoned for the Court:

Not much in the way of evidence corroborative of the accomplice's testimony has been required by our cases. We have, however, consistently held the view that while the corroborative evidence need not be sufficient in itself to convict, *it must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself.*

281 Md. at 244, 378 A.2d at 1107 (emphasis added); *see also Wright v. State*, 219 Md. 643, 150 A.2d 733, *cert. denied*, 361 U.S. 851, 80 S.Ct. 112, 4 L.Ed.2d 90 (1959). *Brown* held that the accomplice's testimony was adequately corroborated under the circumstances. "There was testimony from the appellant's mother and daughter, and from the appellant herself, of material facts independent of the accom-

plice's testimony that tended to show that the appellant was either identified with the perpetrators of the crime or participated in the commission of the crime itself." *Id.* [281 Md.] at 246, 378 A.2d at 1108.

In this case the trial judge's instruction as to the degree of corroboration required of an accomplice's testimony was correct. The judge stated:

In order to constitute sufficient evidence upon which a finding of guilt could be based, the testimony of an accomplice must be corroborated. By that I mean it must be supported in some way by some other independent evidence. However, such corroboration need only be slight. If there is evidence independent of the testimony of the accomplice which tends to identify the accused with the perpetrators of the crime or with the commission of the crime itself, then the testimony of the accomplice may be said to have been sufficiently corroborated.

After our review of the record, we conclude there is no question that the State presented adequate corroborative evidence for the jury's consideration.

While Gardner's testimony in and of itself was not sufficient to substantiate Collins' participation in the robbery and subsequent murder, it does provide further corroborative evidence tending to connect Collins and Michie to the crime. Collins was not prejudiced by the prosecutor's references to the evidence which tended to establish legal corroboration of Michie's testimony. The prosecutor's argument, while not wholly accurate, does not constitute reversible error.

II.

*Evidence of the Accomplice's Drug Charges*

Collins alleges the trial court erred when it declined to allow detailed and continued interrogation regarding drug charges brought against Michie. The police had found substantial quantities of drugs in Michie's home two days after the homicide. The judge limited evidence regarding the charges brought against Michie for two reasons: 1)

Michie had not been convicted of possessing the drugs and 2) two other people were also in the house at the time the drugs were found. Collins argues that this evidence was admissible to demonstrate that "Michie's motive for participating in the crime was other than the one [given on the witness stand]." If Michie had substantial quantities of drugs in his possession, it was a logical inference that he was in the business of selling narcotics. This evidence would arguably be contrary to Michie's testimony that he was broke and in need of money. Collins also contends the evidence was relevant to show his motive for testifying as a state's witness.

We conclude the trial judge did not commit reversible error in his ruling limiting the evidence concerning Michie's pending drug charges. As the prosecutor revealed to the court at trial, the disposition of those charges was not part of Michie's agreement to testify against Collins. On appeal, Collins does not take exception to the prosecutor's proffer. Evidence establishing Michie's possible bias or motive for testifying was effectively before the jury from Michie, and from other sources. There was ample evidence of Michie's drug involvement to allow the jury to assess his credibility.

In addition, Michie thoroughly outlined his plea agreement with the State during his direct examination. Under these circumstances, the decision of the trial judge to disallow further evidence of Michie's pending narcotics charges was harmless error. *See Johnson v. State*, 303 Md. 487, 528, 495 A.2d 1, 22 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986) ("It is a fundamental rule of appellate procedure that a reviewing court will not reverse upon rulings on evidence where the ruling did not result in prejudice to the complaining party."); *see also Tully v. Dasher*, 250 Md. 424, 436, 244 A.2d 207, 214 (1968).

### III.

*Beyond a Reasonable Doubt Jury Instruction*

Collins next argues the trial court's jury instruction on the beyond a reasonable doubt standard was erroneous.

As part of the explanation of reasonable doubt, the trial judge added:

All that is necessary is that the State prove guilt beyond a reasonable doubt, beyond a doubt based on reason. In other words, you must be reasonably certain of the guilt of the accused in order to convict. You can have some doubt and still have the finding of guilt. The proof necessary is that which you would act upon in important matters involving important affairs in your own personal lives or businesses.

Defense counsel excepted to this definition of reasonable doubt. The court then reinstructed the jury as follows: "Also in the burden of proof that the State must meet ... is proof beyond a reasonable doubt and to a moral certainty. You must be satisfied to that extent as to each element of the various charges." Counsel maintains that the wording "reasonably certain" was misleading and significantly lowered the burden of proof. The use of the phrase "reasonably certain" allegedly conveyed "a confusing message as to a vital component of every criminal trial."

In *Poole v. State*, 295 Md. 167, 453 A.2d 1218 (1983), we discussed the adequacy of a reasonable doubt instruction in a death penalty case and stated: "It is well settled that 'when objection is raised to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole.' " *Id.* at 186, 453 A.2d at 1228; quoting *State v. Foster*, 263 Md. 388, 397, 283 A.2d 411, 415 (1971), *cert. denied*, 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972). In an earlier case, *Lambert v. State*, 193 Md. 551, 559, 69 A.2d 461, 464 (1949), we noted that it is proper for a judge to comment or explain the meaning of reasonable doubt. "A definition is not reversible error unless, by reason of peculiar circumstances or phraseology, such an instruction misleads or confuses the jury." *Id.; see also Lansdowne v. State*, 287 Md. 232, 241, 412 A.2d 88, 92 (1980); *see also Montgomery v. State*, 292 Md. 155, 438 A.2d 490 (1981). *Lambert* found it was not erroneous to instruct the jury

that evidence is sufficient to remove a reasonable doubt "when it convinces the judgment of an ordinarily prudent man of the truth of a proposition with such force that he would act upon that conviction without hesitation in his own most important affairs." *Lansdowne* held a trial judge must give an instruction correctly explaining reasonable doubt if requested by the accused. *Id.* [287 Md.] at 243, 412 A.2d at 93. The current version of the Maryland Pattern Jury Instructions replaces the "without hesitation" phrase with an amended term "without reservation" so that the jury will not confuse the degree of certainty needed with an immediacy of acting upon the certainty. MPJI–Cr 2:02 (1987).

In reviewing the instructions given as a whole in the instant case, including the reinstruction, we find that the trial judge repeatedly and properly focused on the term "reasonable doubt" as the appropriate standard of proof required. The court's reinstruction emphasized that the State must prove each and every element of the case beyond a reasonable doubt. Counsel's failure to except to the reinstruction is indicative of an acceptance and approval of the amended form used. Under these circumstances, defense counsel has failed to preserve the challenge to the court's instructions on reasonable doubt. Maryland Rule 4–325(e) provides that "no party may assign as error the giving or failing to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." We have previously applied this rule in the context of a death penalty appeal. *Mills v. State,* 310 Md. 33, 68–69, 527 A.2d 3, 20 (1987), *vacated on other grounds,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Booth v. State,* 306 Md. 172, 193, 507 A.2d 1098, 1108–09 (1986), *vacated on other grounds,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). *See generally Young v. State,* 14 Md.App. 538, 565–66, 288 A.2d 198, 213–14 (1972) (Where there was no objection in the trial

court to a judge's supplementary instructions to the jury, the appellant could not assign error as of right.).

## IV.

### Prior Consistent Statements

■ Collins avers the trial court erred when it admitted evidence of "prior consistent statements" made by the accomplice, Michie, to other witnesses. As part of its theory of the case, the State presented evidence that Michie and Rodney Bennett (Bennett) conspired to fabricate a story concerning Michie's involvement in the homicide shortly after Michie learned that he was wanted for questioning. Bennett was permitted to testify over counsel's objection as to alleged hearsay statements Michie made to him regarding the murder.

Under Maryland law, evidence of a witness' prior statement, consistent with the witness' testimony as to a noncollateral matter, sometimes may be introduced if the credibility of the witness has been attacked. *See, e.g., City of Baltimore v. Zell*, 279 Md. 23, 27, 367 A.2d 14, 17 (1977); *Cross v. State*, 118 Md. 660, 670, 86 A. 223, 227 (1912); *Runge v. State*, 78 Md.App. 23, 41, 552 A.2d 560, 569–70, *rev'd on other grounds*, 317 Md. 613, 566 A.2d 88 (1989); *Finke v. State*, 56 Md.App. 450, 494, 468 A.2d 353, 376 (1983), *cert. denied*, 299 Md. 425, 474 A.2d 218, *cert. denied*, 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984); *Thomas v. Owens*, 28 Md.App. 442, 449, 346 A.2d 662, 666 (1975); *see also* 6 L. McLain, *Maryland Practice: Maryland Evidence* § 613.2, at 168. The prior statement is admissible not as substantive evidence but in order to rehabilitate the witness' credibility. *See, e.g., Borza v. State*, 25 Md.App. 391, 410, 335 A.2d 142, 153, *cert. denied*, 275 Md. 746 (1975); 4 *Wigmore* § 1132 (rev. 1972).

■ We find Bennett's testimony was properly admitted as prior consistent statements for the purpose of rehabilitating the earlier testimony of Michie concerning his initial statement to the police. Defense counsel had impeached

Michie on the fact that his initial statement to the police did not identify Collins as his accomplice. Bennett's testimony tended to corroborate the fact that Michie participated with Collins in the events leading to the homicide.

## V.

### Officer's Observations in Executing Search Warrant

■ Collins claims the trial court committed reversible error in allowing Officer Naylor to testify regarding his observations when he executed a search warrant of appellant's home.[8] Collins had contended the warrant was invalid and that Naylor's observations would need to have been suppressed as the fruit of an illegal search. *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). Naylor had identified a basement room as Collins' bedroom.

The trial court recognized the problem with Naylor's testimony, but permitted him to respond under the stipulation that he not identify the room in which appellant lived. Defense counsel immediately sought a mistrial which was summarily denied. The court cautioned the jury, however, through the following instruction:

> [T]he comment made a moment ago by the witness, by the detective, as to where Mr. Collins may or may not have lived in that particular house, you are to ignore that. Wipe it from your minds if it is possible to do so. Don't consider it anymore during the trial of this case.[9]

The prosecutor's position at trial was that her only agreement prior to trial involved her not introducing any of the

---

**8.** When Michie revealed Collins' name to the Baltimore County Police, they obtained a search and seizure warrant for Collins' residence at 1821 North Regester Street in Baltimore City. Defense counsel had withdrawn his motion to suppress after the State had asserted on the record that it would not introduce any evidence derived from that search.

**9.** After a second bench conference, the judge reinstructed, "Folks, what I meant to say, I may have misstated it, but the detective made some comment about who slept or lived in a particular room in that house ... you are to ignore what the detective said about it."

objects that may have been seized pursuant to the search warrant. Contrary to Collins' arguments, the trial court did not find that the prosecutor had violated any stipulation or agreement with the defense. In good faith, the trial court resolved the problem by striking the single reference to Collins' bedroom. Under these circumstances, we find the trial judge's curative instruction was sufficient and no prejudice resulted to the defendant.

As evidenced by the circumstances of the trial, defense counsel did not argue that Collins did not know Michie. Thorpe also later testified concerning the interior of Collins' house including describing the location of appellant's bedroom. Thorpe was present in Collins' house the day he admitted killing Breeden, and testified he had been there previously. Since other evidence on the same issue was admitted without objection, no prejudice resulted to the accused. *Jones v. State, supra* [310 Md.] at 589, 530 A.2d at 753.

## VI.

### *Use of Detective's Notes for Cross-Examination*

◼ Collins next argues the trial court erred when it ruled defense counsel was not entitled, prior to cross-examination, to obtain a copy of a statement made by Thorpe. Counsel requested a copy of that part of a written report by detective Naylor that contained references to a statement given by Thorpe to the police. The State's position at trial was that they were only required to provide copies of "any written statements or grand jury testimony only after the witness has testified" concerning the matters in question. The detective's report here contained a paraphrased summary of notes taken during a June 3, 1987 conversation with Thorpe. The trial judge denied the motion to produce the notes of this conversation.

In *Carr v. State,* 284 Md. 455, 397 A.2d 606 (1979), we thoroughly reviewed state and federal cases discussing the prosecutor's duty to disclose relevant and material informa-

tion favorable to the defense. Specifically, the Court evaluated the extent of the duty to disclose statements of witnesses in relation to violations of the defendant's right to a fair trial under the Due Process Clause. We held the circumstances in *Carr* amounted to a violation of due process and required the mandate of a new trial. The Court reasoned as follows:

> We have here no 'fishing expedition' in advance of trial. We have testimony on matters involving identity which may be inconsistent with the *prior signed statement* by this witness. It was then that trial counsel made his request for this signed statement. Every skilled advocate knows the crucial importance in such situations of cross-examination. Effective cross-examination here made it necessary that defense counsel be permitted to directly confront the witness with his inconsistent prior statement.

*Id.* at 472–73, 397 A.2d at 614–15 (emphasis added); *see also Leonard v. State,* 46 Md.App. 631, 637–38, 421 A.2d 85, 89 (1980); *aff'd,* 290 Md. 295, 429 A.2d 538 (1981). Later in *Jones v. State, supra,* we applied *Carr* and held that a discoverable " 'statement' under Maryland law is one given by a witness under the circumstances set forth in § 3500(e)" of the *Jencks Act,* 18 U.S.C. § 3500 (1985). 310 Md. at 584, 530 A.2d at 751.[10] We held that two statements taken by the police authorities were summaries of information given to them during witness interviews. "They were neither signed nor adopted by Mrs. Jordan. Accordingly, the rule

---

10. In this regard, 18 U.S.C. § 3500(e) provides in pertinent part:
(e) The term 'statement' ... in relation to any witness called by the United States, means—
 (1) A written statement made by said witness and signed or otherwise adopted and approved by him;
 (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
 (3) A statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

in *Carr* is inapplicable to them." *Id.* [310 Md.] at 586, 530 A.2d at 751. In so holding, *Jones* was in accord with prior decisions of the Court of Special Appeals which deny the use of police notes and investigatory summations not adopted by witnesses as their own. *Id.; see also Jacocks v. Montgomery County,* 58 Md.App. 95, 472 A.2d 485 (1984); *Whitehead v. State,* 54 Md.App. 428, 458 A.2d 905, *cert. denied,* 296 Md. 655 (1983).

In the present case, we conclude Thorpe's statement paraphrased in the police report was similar to the statements found non-discoverable in *Jones.* The statement here essentially was a summary of detective Naylor's interview with Thorpe. Contrary to our rule set forth in *Jones,* Thorpe neither signed, adopted or approved of the facts contained in the summary. The detective drafted the report subsequent to the actual interview. Without such ratification, the detective's notes may be classified as his work product, and are not generally discoverable. If the witness has not expressly approved of the statements, it would be unfair for the evidence to be used for impeachment purposes. Under these circumstances, the court did not abuse its discretion in concluding that the detective's report was not discoverable prior to the commencement of cross-examination.

## VII.

### Parole Instruction

■ Appellant contends the trial court committed error in refusing to instruct the jury on the issue of parole. Counsel sought the following jury instruction at trial:

A sentence of life imprisonment presumptively means that the prisoner will spend the remainder of his natural life in prison, although he may be considered for parole at some point during his lifetime after having served a certain portion of his sentence. [The defendant] will be allowed or may be, excuse me, may be considered for parole at some point during his lifetime after having

served a certain portion of the sentence. An agency known as the parole commission is empowered by statute to determine if and when and under what circumstances a prisoner may be paroled. There is no right to be released on parole. Under our law, no prisoner can be paroled unless the parole commission is of the opinion that the prisoner when released will assume a proper place in society and that his release is not contrary to the welfare of society. A prisoner released on parole may remain on parole for the balance of his life, and if he violated the terms of his parole, he can be returned to prison to serve the life sentence. It would be a violation of your duty as jurors for you to impose a penalty of death because of a doubt that the parole commission will properly carry out its responsibilities.

The judge declined to give the requested instruction.

Under Md. Rule 4–325(c), "the court ... shall, instruct the jury as to the applicable law...." It is the responsibility of the trial judge, when requested, to give a correct instruction on every essential point of law involved in a criminal proceeding. *See Dillon v. State,* 277 Md. 571, 584–85, 357 A.2d 360, 368–69 (1976); *Jackson v. State,* 46 Md.App. 325, 329, 416 A.2d 1353, 1355 (1980). In *Doering v. State,* 313 Md. 384, 545 A.2d 1281 (1988), we concluded that "a jury seeking to determine the appropriateness of a life sentence will be aided by information correctly describing the legal and practical effects of such a sentence," including "relevant and competent information concerning his eligibility for parole." *Id.* at 411–12, 545 A.2d at 1295. This decision was made in the context of reviewing the trial judge's refusal to allow evidence at the sentencing proceeding. Here, the instruction requested by Collins' counsel was not an accurate statement of the law. *See* Art. 27, § 413A; *Foster, Evans and Huffington v. State,* 305 Md. 306, 317, 503 A.2d 1326, 1331–32, *cert. denied,* 478 U.S. 1010, 1023, 106 S.Ct. 3310, 3315, 92 L.Ed.2d 723, 745 (1986). Under the circumstances here, we find the trial court properly refused to give the instruction as requested.

## VIII.

### *Closing Argument Reference to Victim's Family*

 Collins maintains the prosecutor's closing argument comments regarding the victim's family were impermissible under *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). The State's Attorney noted in her concluding remarks during the sentencing phase:

> While you are back in that jury room, if you find that your strength is waivering or your conviction is waivering and you need an example of strength and conviction to look to, there it is right there (indicating). These people have sat throughout these proceedings and waited for the past 18 months for one thing, and that is justice.

Counsel immediately objected to this reference as improper victim impact statements. The trial court overruled the objection.

Collins' reliance on *Booth* is not appropriate. The prosecutor's brief comments here are not comparable to the admission of a victim impact statement (VIS) during the sentencing phase of a capital murder trial. In *Booth*, the VIS provided the jury with two types of information.[11] First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family. Second, it set forth the family members' opinions and characteristics of the crimes and the defendant. The Supreme Court noted, "The focus of a VIS, however, is not on the defendant, but on the character and reputation of the victim and the effect on his family. These factors may be wholly unrelated to the blameworthiness of a particular defendant." *Id.*, 482 U.S. at 504, 107 S.Ct. at 2534, 96 L.Ed.2d at

---

**11.** *See* Md.Code (1957, 1986 Repl.Vol.), Art. 41, § 4–609(c) (VIS shall include references to the psychological effects of the crime on the victim's family). For example, the victim's son and daughter told of sleeplessness, depression, and painful memories associated with the offenses. The VIS report in *Booth* concluded the murder was "such a shocking, painful and devastating memory" to the family that "it permeates every aspect of their daily lives."

449. The *Booth* Court continued: "Allowing the jury to rely on a VIS therefore could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill." *Id.*

The Supreme Court found that "because of the nature of the information contained in a VIS, it creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." *Id.* "[T]he formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Id.*, 482 U.S. at 508, 107 S.Ct. at 2536, 96 L.Ed.2d at 452. The Supreme Court concluded that the introduction of a VIS at the capital sentencing phase violates the Eighth Amendment of the U.S. Constitution. Therefore, the Maryland death statute was declared invalid to the extent it allowed consideration of VIS information. Md.Code (1957, 1986 Repl.Vol., 1989 Cum.Supp.), Art. 41, § 4–609(d); *see* Art. 27, § 413(c)(iv).[12]

Later, in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), petitioner claimed on appeal that the trial judge improperly allowed into evidence statements concerning the personal characteristics of the victim, allegedly in violation of *Booth.*[13] Since the majority found

---

**12.** In a recent law review article, Note, *Booth v. Maryland—Death Knell for the Victim Impact Statement?*, 47 Md.L.Rev. 701, 731 (1988), the author concluded:

Instead of focusing exclusively on the very real procedural flaws in the use of such information before a capital sentencing jury, the Supreme Court examined the very nature of victim impact evidence, holding it irrelevant to questions of criminal culpability. In addition, the Court found the Maryland Impact Statement procedurally troublesome, inflammatory, and overly prejudicial.

**13.** Attached to the Maryland Division of Parole and Probation's investigation report of the crime in that case was a memorandum to the State's Attorney. This memorandum summarized an interview conducted by a caseworker with the victim's brother and sister-in-law.

dispositive petitioner's argument that the jurors may not have understood the unanimity requirements of the sentencing instructions and jury charges, it failed to reach the VIS issue. Chief Justice Rehnquist, speaking for four dissenting justices, explained that *Booth* was not intended to preclude any reference or information about the victim:

> By contrast [to Booth], the summary admitted here gave only the barest details about [the victim] himself and no information at all about the impact of his death on others. I do not interpret *Booth* as foreclosing the introduction of all evidence, in whatever form, about a murder victim, and would thus conclude that the trial court did not commit error in admitting the summary in this case.

*Id.* at 398, 108 S.Ct. at 1877, 100 L.Ed.2d at 408–09.

The reasoning of Chief Justice Rehnquist was as follows:

> [The memorandum] did not purport to be, and the Maryland Court of Appeals found that it did not fall within the statutory requirements of, a victim impact statement under Maryland law. *See* Md. Code (1957, 1986 Repl.Vol.), Art. 41, § 4–609(c). The statements summarized in the memorandum *did not describe the effect of the murder on the family and friends of the victim. Nor did the memorandum contain opinions and characterizations by [the victim's] brother and sister-in-law of the crime.* At most, this thumbnail sketch of the victim's difficult childhood and frequent encounters with correctional authorities gave the jury a quick glimpse of the life petitioner chose to extinguish.

*Id.* at 397, 108 S.Ct. at 1876, 100 L.Ed.2d at 408 (emphasis added).

In the present case, we rule the prosecutor's comments were not evidence, were not inflammatory under these circumstances and therefore are not properly comparable to the admission of a VIS. The comments did not describe the effects of the murder on the Breeden family. *See State v. Colvin,* 314 Md. 1, 22, 548 A.2d 506, 516 (1988).

## IX.

### *Admissibility of Defendant's Juvenile Record and Institutional History*

 Collins claims the trial judge erred in permitting the jury to consider, during the sentencing phase, evidence of his juvenile record and later institutional history.[14] These records were part of a presentence investigation report which was admitted into evidence after certain redactions were made by the trial judge. Counsel's primary objection to the references of prior juvenile offenses was that there was no evidence to support these offenses because appellant's juvenile file had been destroyed. Therefore, the evidence was allegedly unreliable, and neither probative nor relevant. The institutional infractions included "being out of bounds," "lateness" and "disobedience" which were part of a closed parole file. Counsel argued that these general offenses "reflect badly on him without him really having an opportunity to redress it." The specifics of these infractions were not detailed in the report. "Without an explanation of these terms [in the PSI] and Appellant's specific conduct, the jury was left to believe that appellant, even when institutionalized, cannot be controlled."

Article 27, § 413(c)(iv) expressly provides that "any presentence investigation report" is admissible in a capital sentencing proceeding. In addition, Article 41, § 4–609(d) provides in pertinent part:

In any case in which the death penalty or imprisonment for life without the possibility of parole is requested under Article 27, § 412, a presentence investigation ... shall be completed by the Division of Parole and Proba-

---

**14.** The information of Collins' juvenile record was included in a prior PSI incorporated by reference into the PSI prepared in this case. The prosecutor noted on the record that the PSI identified the source of the adjudications of delinquency and the fact that the presentence investigator checked the juvenile records to verify the information.

tion, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Article 27, § 412 or § 413.

In *Huffington v. State*, 304 Md. 559, 577–78, 500 A.2d 272, 281 (1985), *cert. denied*, 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986), we ruled that the prior institutional history of a defendant is admissible in a capital sentencing proceeding as part of the presentence investigation report. It is admissible because "the convicted person's reputation, past offenses, health, habits ..." are appropriate considerations for the sentencing authority in a death penalty case. *Id.* at 577, 500 A.2d at 281, quoting *Bartholomey v. State*, 267 Md. 175, 193–94, 297 A.2d 696, 706, *remanded*, 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972) (citations omitted). Huffington's presentence investigation report noted that he was cited for "1) refusing to obey a direct order, and 2) creating a security threat."

Collins contends *Huffington* is distinguishable from the present case because the report there contained one sentence explaining the facts surrounding each infraction. We disagree. The legislative mandate of Art. 27, § 413 regarding admissibility of evidence is clear. The only limit placed upon the admissibility of presentence investigation reports is in reference to "any recommendation as to sentence contained in the report." Even if we were to construe the institutional history as "other evidence" under Art. 27, § 413(c)(v), we note that Collins had a fair opportunity to rebut or explain the circumstances concerning the institutional infractions for the jury. We find no merit in Collins' arguments regarding the admission of the appellant's institutional history.

Similarly, the information about Collins' juvenile record was properly admitted and reliable. It is the defendant's burden to establish an error in the PSI. The fact that hypothetically there may have been a mistake is insufficient to support a finding of reversible error.

■■■■■■■■■■

### X.

### *Constitutionalitv of Art. 27, § 413(h)*

■■■ Collins claims the use of the preponderance of the evidence standard in the Maryland death penalty statute is violative of the Eighth Amendment cruel and unusual punishment clause and of the due process clause. Collins apparently refers to the final stage of the capital sentencing special verdict form where the jury is asked to determine, by a preponderance of the evidence, whether the aggravating circumstances outweigh the mitigating circumstances. Art. 27, § 413(h).

We have previously reconsidered and reaffirmed the rule that a preponderance of the evidence test is proper in weighing aggravating and mitigating factors. *State v. Calhoun,* 306 Md. 692, 739–40, 511 A.2d 461, 485 (1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987); *Foster v. State,* 304 Md. 439, 477, 499 A.2d 1236, 1255–56 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *Tichnell v. State,* 287 Md. 695, 729–734, 415 A.2d 830, 848–50 (1980), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). Under Maryland's capital sentencing scheme, the sentencing authority may not even consider the appropriateness of a death sentence unless the State has established, beyond a reasonable doubt, that one or more statutory aggravating circumstances exist. Art. 27, § 413(d). Moreover, the State has the burden of showing that aggravating outweigh mitigating circumstances. *Scott v. State,* 310 Md. 277, 284, 529 A.2d 340, 343 (1987) (This Court has consistently held that the state bears the burden of persuasion under Art. 27, § 413(h)); Md. Rule 4–343(e) (Section IV). Under the circumstances of this case, we find no basis for reevaluating the rule set forth in *Calhoun, Foster* and *Tichnell.* Again, we hold the preponderance of the evidence standard is constitutionally proper in the context of Art. 27, § 413(h).

## XI.

### *Sufficiency of Charging Document*

 Collins next asserts that the imposition of the death penalty in his case is unconstitutional under Article 21 of the Maryland Declaration of Rights because the charging document did not specify the statutory aggravating factor upon which the State wished to proceed.[15] The most basic purposes of a criminal charge are to 1) accurately characterize the crime and the particular offense so as to put the accused on notice of what he is called upon to defend and 2) to prevent a future prosecution for the same offense. *See, e.g., Lank v. State,* 219 Md. 433, 436, 149 A.2d 367, 368 (1959). Generally, the accused must be apprised of the nature of the charges against him.

The notice the State is required to serve upon the defendant in a capital case is set forth in Art. 27, § 412(b)(1)(i).[16] This notice includes each aggravating circumstance upon which the State intends to rely in pursuing the death penalty. Art. 21 of the Md. Decl. of Rts. does not require that this statutory notice be attached to the charging document. The proof of the aggravating circumstance(s) is always directly relevant in the sentencing phase of a capital case. We find no merit in Collins' contention regarding the sufficiency of the indictment in this case.

---

**15.** Art. 21 of the Md. Decl. of Rts. states:
"That in all criminal prosecutions, every man has a right to be informed of the accusation against him" and "to have a copy of the indictment, or charge, in due time, if required, to prepare for his defense."

**16.** Art. 27, § 412(b)(1), (1989 Cum.Supp.) provides in pertinent part:
(b) *Penalty for first degree murder.*—Except as provided under subsection (f) of this section, a person found guilty of murder in the first degree shall be sentenced to death, imprisonment for life, or imprisonment for life without the possibility of parole. The sentence shall be imprisonment for life unless: (1)(i) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of death, and advised the person of each aggravating circumstance upon which it intended to rely....

## XII.

### *Life Without Parole Sentencing Option*

 Collins maintains that the trial court erred in denying counsel's motion to have life without the possibility of parole considered as a sentencing alternative. *See* Art. 27, § 412(b). He principally relies on the Supreme Court's decision in *Beck v. Alabama,* 447 U.S. 625, 642–46, 100 S.Ct. 2382, 2392–94, 65 L.Ed.2d 392, 406–08 (1980) for the proposition that an all or nothing statutory scheme is unconstitutional where the evidence warrants a lesser included offense instruction. *See Hook v. State,* 315 Md. 25, 553 A.2d 233 (1989).[17]

We rule the life without parole sentencing option is only available for offenses occurring after the effective date of the provision, July 1, 1987. Ch. 237, Laws of 1987. The instant offense occurred prior to the effective date. Therefore, Collins' argument regarding a statutory right to the life without parole sentencing option has no merit. Here, the sentencing jury was given a proper option, either death or life imprisonment. The addition of a third alternative for life without the possibility of parole as a result of Chapter 237 of the Laws of 1987 does not render the sentencing verdict in this case any less reliable. We find no constitutional violation under the circumstances. The problem associated with the possibility of an improper compromise verdict found unconstitutional in *Beck* is not applicable in the present case.[18]

## XIII.

### *Proportionality Review*

 Collins urges that his death sentence should be vacated on proportionality grounds. At the hearing on

---

**17.** Both *Beck* and *Hook* involved the propriety of lesser included offense instructions.

**18.** Whether the principle of *Beck* would apply after the effective date of the life without parole sentencing statute is not before us in this case and is a question we do not decide.

Collins' motion for a new sentence, defense counsel submitted an exhibit consisting of separate reports allegedly involving similar factual situations.[19] The cases generally arise out of murder committed during the course of a robbery. Counsel identified six cases, including the instant one, where robbery was the sole aggravating circumstance. Collins maintains that his death sentence is disproportionate under Art. 27, § 414(e).

Article 27, § 414(e) provides in pertinent part, "With regard to the sentence, [this] Court *shall* determine:

> (4) Whether the sentence of death is excessive or *disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.* (Emphasis added).

In the process of our proportionality review function, we have considered the cases cited by appellant. We conclude both similarities and differences can be found in the respective cases. It would not be helpful to set forth the details of each case reviewed here. "Although we have reviewed the cases cited by the defendant, we perceive no useful purpose in setting them out seriatim, with some particular facts included about each case and each defendant." *Foster v. State*, 304 Md. 439, 484, 499 A.2d 1236, 1259 (1985), *reconsideration denied*, 305 Md. 306, 503 A.2d 1326, *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986) (death sentence for murder committed in course of robbery was not disproportionate to penalties imposed in similar cases where defendant committed brutal crime for personal gain, plotted it in advance, and proceeded methodically to

---

19. Trial judge reports submitted pursuant to Maryland Rule 4–343(h) were provided for those cases where separate death penalty sentencing procedures were conducted. In the remaining cases where the death penalty was not sought, presentence investigation reports, Maryland Office of the Public Defender reports and appellate decisions were submitted. All of the cases were brought after the effective date of Maryland's death penalty statute. Section 3, Chapter 3, Acts 1978 (effective July 1, 1978). A total of 169 reports were submitted.

carry out her plan). "When comparing the instant case . . ., both similarities and differences can be found." *Id.*

This case is an eligible death penalty offense under Art. 27, § 413(d)(10). Our analysis indicates that death penalty sentences have been imposed in a significant number of cases where the aggravating circumstance(s) involved a murder committed during the course of a robbery. Considering both the crime and the defendant, along with "similar cases," we conclude the death sentence was neither excessive nor disproportionate. We also find Collins' death sentence was not aberrant, arbitrary, capricious or freakish. *See generally Thomas v. State,* 301 Md. 294, 334, 483 A.2d 6, 27 (1984); *see also, McCleskey v. Kemp,* 481 U.S. 279, 302–09, 107 S.Ct. 1756, 1772–75, 95 L.Ed.2d 262, 284–89, *reh'g denied,* 482 U.S. 920, 107 S.Ct. 3199, 96 L.Ed.2d 686 (1987); *Pulley v. Harris,* 465 U.S. 37, 54, 104 S.Ct. 871, 881, 79 L.Ed.2d 29, 42–43 (1984).

Finally, upon our examination of the record, we conclude that the death sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor; that the evidence supports the jury's finding of a statutory aggravating circumstance, and the evidence supports the jury's finding that the aggravating circumstances are not outweighed by mitigating circumstances. Art. 27, § 414(e).

We find no reversible error in any of the contentions raised by Collins. It follows that the death sentence must be affirmed.

JUDGMENT OF THE CIRCUIT COURT FOR SOMERSET COUNTY AFFIRMED.