583 A.2d 218

**Flint Gregory HUNT**

v.

**STATE of Maryland.**

**No. 110, Sept. Term, 1989.**

Court of Appeals of Maryland.

Dec. 28, 1990.

Motion for Reconsideration Denied Feb. 6, 1991.

390

392

398

**400**

José Felipé Anderson, Asst. Public Defender and George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, all on brief) Baltimore, for appellant.

Valerie J. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Mary Ellen Barbera, Asst. Atty. Gen., all on brief) Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHASANOW, JJ.

CHASANOW, Judge.

Appellant, Flint Gregory Hunt, was convicted by a jury in the Circuit Court for Baltimore City of the first degree murder of Officer Vincent Adolfo. The jury also convicted Hunt of using a handgun in the commission of a felony or a crime of violence and unlawfully wearing, carrying, or transporting a handgun. The jury sentenced him to death for the murder. This Court affirmed the murder conviction, but vacated the sentence of death and remanded the case to the circuit court for a new capital sentencing hearing. *Hunt v. State*, 312 Md. 494, 511, 540 A.2d 1125, 1133 (1988). We also affirmed the conviction for use of a handgun and vacated the conviction for wearing of a handgun.

The jury in Hunt's second sentencing hearing imposed the death penalty. The jury found the existence of two aggravating circumstances: that the victim was a law enforcement officer murdered while in the performance of his official duties; and that Hunt committed the murder in an attempt to escape lawful arrest. Some jurors, but not a majority, found two mitigating circumstances: Hunt's childhood experiences, and a stabbing Hunt suffered while incarcerated on another conviction before Officer Adolfo's murder occurred. The jury found that the aggravating circumstances outweighed the mitigating circumstances, and sentenced Hunt to death. Hunt appeals that sentence on many grounds, which we will address in turn. Before doing so, it would be appropriate to reiterate the facts surrounding the murder.

"While on patrol the evening of November 18, 1985 at approximately 5:20 p.m., Officer Vincent Adolfo noticed a new Cadillac with a missing window covered with plastic.

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court, but did not participate in the decision and adoption of this opinion.

In addition to the driver, the vehicle contained three other occupants. The officer, following a routine stolen car inquiry, learned that the car had been stolen. He broadcast a description of the occupants of the car and noted that the driver was 'not breaking any laws right now.'

Two officers in separate patrol cars, responding to Officer Adolfo's request for back-up, attempted to block the path of the on-coming Cadillac. Upon nearing the road-block, the driver, later identified as Hunt, jumped out of the car while it was still moving and ran up a nearby alley. The Cadillac then struck one of the parked patrol cars and stopped; an officer detained the three passengers who were still in the car.

Officer Adolfo pursued Hunt into the alley. Upon apprehending him, the officer positioned him against a wall and tried to handcuff Hunt. Hunt pushed away, knocking the officer off balance. Hunt then pulled a .357 Magnum from his jacket and shot Officer Adolfo in the chest at close range. Within seconds, as the officer reeled from the first shot, Hunt shot him again, this time in the back. Hunt fled the scene of the crime. Officer Adolfo was pronounced dead at the hospital at 6 p.m.

In the meantime, Hunt had called his friend, Angelo Williams, and asked him to keep the gun for him, saying that he had just shot a policeman. Hunt and his girl friend, Deborah Powell, then went to his sister's house, only to leave when a television broadcast indicated that Hunt was being sought in connection with the murder.

\* \* \* \* \* \*

The next day, Hunt and Powell drove to Camden, New Jersey. En route, Hunt admitted to Powell that he had shot the policeman. Hunt then boarded a bus to Santa Monica, California, leaving Powell behind. He was apprehended at a Tulsa, Oklahoma bus station five days later."

*Hunt,* 312 Md. at 498–99, 540 A.2d at 1126–27. Hunt was returned to Baltimore, where on June 30, 1986, he was convicted of murdering Officer Adolfo, of using a handgun

in the commission of a felony or a crime of violence, and of unlawfully wearing, carrying, or transporting a handgun.

Following his conviction and first sentencing hearing, Hunt was assigned to the Maryland Penitentiary to serve his prison sentence and await the decision on his appeal. While in prison, Hunt committed a series of violations which led to his being isolated from other prisoners and to the loss of good time credits. Guards twice found Hunt in possession of knives. On one occasion the guards found a homemade weapon in a light fixture in Hunt's cell. On another, prison guards saw a knife fall out of Hunt's underwear. Hunt also feigned an illness so that he would be transported to the hospital. He later wrote to a fellow inmate that he had pretended to be ill to "see what my chances for freedom were."

During the second sentencing hearing, when the judge became aware of Hunt's prison behavior, particularly the attempt to "see what my chances for freedom were," he held a hearing and then ordered Hunt to wear leg irons for the duration of the proceeding. The resentencing jury heard evidence regarding the murder of Officer Adolfo and of Hunt's subsequent prison behavior. The jury was given a presentence investigation report detailing Hunt's long criminal history, which included convictions for armed robbery, larceny, and other crimes. Hunt offered evidence of a troubled childhood, a history of drug abuse, the probability that he was high on drugs when he shot Officer Adolfo, and a stabbing he suffered while incarcerated at the Maryland Correctional Institution in Hagerstown. He exercised his right of allocution, and expressed remorse for killing Officer Adolfo. The jury found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Hunt to death.

## I. FAILURE TO INFORM JURY OF HUNT'S HANDGUN SENTENCE

Hunt contends that the trial judge erred in refusing to either instruct the jury that Hunt had already been sen-

tenced to 20 years in prison for using a handgun in the murder of Officer Adolfo, or to reopen the case so that Hunt could offer evidence of the sentence. In the alternative, Hunt argues that his trial counsel was ineffective in failing to offer the evidence during his case in chief.

■ A defendant in a death penalty sentencing hearing may offer any relevant and competent information that would aid the jury in assessing the legal and practical effect of a sentence less than death. *Doering v. State*, 313 Md. 384, 411–12, 545 A.2d 1281, 1295 (1988). A separate sentence for another crime might have a mitigating effect on the jury. *Harris v. State*, 312 Md. 225, 251, 539 A.2d 637, 650 (1988) (*Harris V*, because this was Harris' fifth appeal in this Court). A jury, concerned that a defendant be properly punished and not have a chance for an early parole, might find a longer prison stay to be an acceptable alternative to the death penalty.

Hunt could have, as part of his evidence of mitigation, offered proof of the handgun sentence. Had he done so, the evidence would have been admissible. In fact, the prosecutor conceded that he would not have objected to such an offer. But Hunt failed to do so, despite ample opportunity throughout his case in chief. Hunt's belated attempt to make the jury aware of the handgun sentence after both sides had rested their cases was subject to the discretion of the judge.

### A. Hunt's Request for a Jury Instruction

■ Hunt first asked that the judge take judicial notice of the handgun sentence and instruct the jury that:

"Mr. Hunt has already received a 20 year sentence for a handgun violation that was related to the offense in this case. That sentence will be served in addition to a sentence of life should your sentence be life imprisonment."

The judge properly refused the requested instruction. The proposed instruction was misleading. It asserted that

the defendant *would* serve 20 years in prison *in addition to* the life sentence the jury might impose for the murder conviction. A consecutive sentence could extend the mandatory minimum time Hunt would have had to serve before being considered for parole; a concurrent sentence would not have the same effect. The judge had no obligation to make the life sentence consecutive to the handgun sentence, and could not declare whether it would be consecutive or concurrent until the defendant had an opportunity to present an allocution. In addition, if the judge had given the proposed instruction, the State would have had no opportunity to rebut or explain the effect of the 20 year sentence. The jury could have only guessed as to the actual impact of the sentence, and its effect on Hunt's parole eligibility. A defendant has no right to an instruction that is inaccurate. *Collins v. State*, 318 Md. 269, 290, 568 A.2d 1, 11, *cert. denied,* —— U.S. ——, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990). Hunt's requested instruction was potentially misleading and the judge did not abuse his discretion in refusing the instruction.

### B. Hunt's Request To Reopen His Case

■ Failing to receive the instruction, Hunt sought to have the judge reopen the case so that he could offer evidence of the sentence. The trial judge has wide discretion in the conduct of a trial. *Smith v. State*, 299 Md. 158, 179, 472 A.2d 988, 998 (1984). The reopening of a case is within the trial judge's discretion and a denial of a motion to reopen will not be disturbed on appeal unless there is an abuse of discretion. *Stansbury v. State*, 218 Md. 255, 262, 146 A.2d 17, 22 (1958). *See also McCloud v. State,* 77 Md.App. 528, 535–36, 551 A.2d 151, 155, *modified,* 317 Md. 360, 564 A.2d 72 (1989) (within the judge's discretion to deny defendant's request to reopen case for purpose of giving testimony in his own defense).

■ The trial judge had ample reasons to deny Hunt's request. The trial had already reached the instructions phase. Both the State and defendant had rested. Had the

judge allowed the defendant to reopen the case in order to present evidence of the handgun sentence, the State might also have sought the opportunity to rebut and explain the effect of parole and good time credits on the 20 year sentence. This might have delayed the jury's deliberations and "unduly stressed the testimony in question...." *Noel v. State*, 202 Md. 247, 252, 96 A.2d 7, 10 (1953). It was a proper exercise of judicial discretion for the trial judge to refuse to allow the defendant to re-open his case.

We should also note that the trial judge's failure to grant Hunt's requests did not result in undue prejudice to Hunt. If the handgun sentence had been introduced and explained, the jury would have discovered that Hunt may have served little or no additional time in prison as a result of this sentence. First, the judge would have had to tell the jury that the handgun sentence might be served concurrently or consecutively to the murder sentence. Second, the death penalty sentencing commenced on November 30, 1988. Hunt had been in custody since November 23, 1985, and he could have been eligible for parole on the handgun sentence as early as January 27, 1990.[1] Hunt established through testimony at the hearing that, if the jury sentenced him to life imprisonment, he could not be considered for parole until he served at least 25 years less up to 6 years time off for good behavior. Failure to establish that the earliest possible parole date should be in approximately 20 years rather than 19 years would not tip the scales and cause the jury to "believe that death may not be appropriate." *Foster v. State*, 304 Md. 439, 475, 499 A.2d 1236, 1254 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).

## C. Ineffective Assistance Of Counsel

 Hunt's alternative argument is that his trial attorney's failure to introduce the handgun sentence into evi-

---

1. Hunt would have been eligible for parole on the handgun charge after five years. Maryland Code (1957, 1990 Repl.Vol.), Article 41 § 4–516(a). He could have earned 300 days of good time, moving his parole date up to January 27.

dence constitutes ineffective assistance of counsel. Defense counsel's failure to introduce evidence of the sentence earlier in the trial may have been trial strategy. A collateral hearing on the issue, more appropriately conducted in a post conviction proceeding, would be necessary to determine whether counsel was ineffective. *Harris v. State*, 299 Md. 511, 517, 474 A.2d 890, 893 (1984) (*Harris II*, because this was Harris' second appeal in this Court). Unlike the case in *Harris II*, we are not "presented with a unique set of facts which justifies resolution of the ineffective assistance of counsel claims in a proceeding other than one under the post conviction procedure statute." *Id.* at 518, 474 A.2d at 893.

## II. SHACKLING OF HUNT

Hunt next contends that the trial judge erred by requiring him to wear leg irons during the sentencing hearing. The issue of shackling a defendant in a death penalty sentencing hearing has been addressed rarely. This Court considered the issue in *Bowers v. State*, 306 Md. 120, 507 A.2d 1072, *cert. denied*, 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986). In *Bowers*, we held that the trial judge did not abuse his discretion in ordering that Bowers wear leg irons during his death penalty sentencing hearing.

The issue was discussed extensively in two other death penalty cases. In *Duckett v. State*, 752 P.2d 752 (Nev. 1988), the trial court had ordered the defendant to wear manacles and prison garb during the penalty phase of the trial after he had been convicted of a double murder. The Nevada Supreme Court sustained the trial judge's action. The court's opinion focused on the fact that the defendant was no longer entitled to the presumption of innocence, as well as the need to protect society from a convicted defendant who "might have concluded that he had nothing to lose from further acts of violence." *Id.* at 755.

In *Elledge v. State*, 408 So.2d 1021 (Fla.1981), *cert. denied*, 459 U.S. 981, 103 S.Ct. 316, 74 L.Ed.2d 293 (1982), the

trial judge ordered that the defendant wear leg irons during a death penalty hearing after learning that the defendant had stated his intention to attack the bailiff and had also become proficient in karate. The defendant was sentenced to death. The Florida Supreme Court affirmed the death penalty. The Court of Appeals for the Eleventh Circuit, in a habeas corpus proceeding, however, reversed the death penalty. That court held that the shackling was inherently prejudicial and that the trial judge failed to provide the defendant with an opportunity to rebut the evidence offered as a justification for the shackling.[2] *Elledge v. Dugger*, 823 F.2d 1439, 1451–52, *modified*, 833 F.2d 250 (11th Cir.1987), *cert. denied*, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).

■ We begin our analysis by noting that the trial judge has broad discretion in maintaining courtroom security. "The courts uniformly rely upon an abuse of discretion standard for reviewing the action of trial judges in the matter of restraint...." *Bowers* 306 Md. at 132, 507 A.2d at 1078. The reviewing court should not determine whether less stringent security measures were available to the trial court, but rather whether the measures applied were reasonable and whether they posed an unacceptable risk of prejudice to the defendant. *Bruce v. State*, 318 Md. 706, 721, 569 A.2d 1254, 1262 (1990).

■ The risk of prejudice varies with the security measure. Some measures are inherently prejudicial and may be used only when there is a compelling state interest specific to the trial. *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525, 534 (1986). Placing a defendant under physical restraints such as leg irons at a

---

**2.** The court distinguishes *Bowers*, which it terms "the only case that squarely addresses the shackling at the capital sentencing stage," on the grounds that Bowers was given an opportunity to contest the necessity of shackling. *Elledge v. Dugger*, 823 F.2d 1439, 1452, *modified*, 833 F.2d 250 (11th Cir.1987), *cert. denied*, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).

guilt/innocence trial is an inherently prejudicial measure and requires a compelling state interest. *Bruce* at 721, 569 A.2d at 1262. This is true because "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S.Ct. 1930, 1934, 56 L.Ed.2d 468, 475 (1978). When the presumption of innocence is lost as the result of a conviction, there is less risk of prejudice at the sentencing hearing. *Bowers* at 136–38, 507 A.2d at 1080–81. *See generally Elledge v. Dugger*, 823 F.2d at 1451 & 1453; *Elledge v. State*, 408 So.2d at 1022–23; *Duckett*, 752 P.2d at 754–55.

Shackling a defendant during the guilt/innocence phase of trial is inherently prejudicial because it highlights the "need to separate a defendant from the community at large...." *Holbrook v. Flynn*, 475 U.S. at 569, 106 S.Ct. at 1346, 89 L.Ed.2d at 534. This concern is not as great during the sentencing hearing. It is clear that the defendant will be separated from the community. The only issue is whether the defendant will receive the death penalty or life imprisonment. The defendant's guilt of first degree murder is established and the jury is less likely to be prejudiced by the defendant's appearance in leg irons.

The defendant "stands in the position of a convicted felon brought before a trial court for sentencing. He thus is unlike the ordinary defendant who at trial stands clothed with a presumption of innocence." *Bowers* at 132, 507 A.2d at 1078. Because of this, other state interests may outweigh any prejudice to the defendant. The most obvious is the State's interest in maintaining custody of a convicted murderer. Perhaps no other defendant appearing before the court has a greater incentive to attempt escape than a convicted murderer facing the possibility of being executed. His "best" hope is a life sentence.

We must determine whether there was an essential state interest in ordering this appellant to wear leg irons during

his sentencing hearing and whether, weighed against the state interest, the order posed an unacceptable risk of prejudice. The prejudice posed by security measures, and whether a compelling state interest outweighs that prejudice, must be measured on a case by case basis. *Bruce*, 318 Md. at 721, 569 A.2d at 1262.

There are three essential state interests which may justify physically restraining a defendant: Preventing the defendant's escape, protecting those in the courtroom, and maintaining order in the courtroom. Unless one or more of these factors outweigh any prejudice to the defendant, physical restraint is inappropriate. The record shows that Hunt was a significant escape risk. He fled the scene and left the State after murdering Officer Adolfo. While in prison, he feigned an illness so that he would be sent to the hospital to "see what my chances were for freedom." Also, the appellant showed an inability to adjust to prison life, reflected by several prison rules violations and his resultant continuous confinement to segregated quarters. He was twice cited for possession of weapons.[3] Finally, the sentencing proceeding was held in a windowed, street level courtroom which might have provided temptation for an escape attempt. *See Billups v. Garrison*, 718 F.2d 665 (4th Cir.1983), *cert. denied*, 469 U.S. 820, 105 S.Ct. 91, 83 L.Ed.2d 37 (1984), where the court found that the combination of a relatively insecure area and the more than average risk of escape satisfied the use of shackles on a defendant in an armed robbery and felonious assault trial. Given the factors taken as a whole, we cannot say that the trial court abused its discretion in determining that appellant was an escape risk and that the need for some physical restraints outweighed any potential prejudice to Hunt.

---

**3.** Appellant made a knife from the metal portion of a light fixture in his cell on one occasion. He hid this weapon in the light fixture. On another occasion, a knife tumbled from his waist when he took off his shirt.

 Hunt contends that the trial judge did not explain his reasons for requiring leg irons. Also, he contends that the trial judge's decision was based solely on the unsupported opinion of Judge Angeletti. He raises two important issues. First, the trial judge should insure that the record reflects the reasons for extraordinary security measures such as physical restraints. *Bowers,* 306 Md. at 138, 507 A.2d at 1081. Second, while the trial judge has broad discretion for courtroom security, he or she may not delegate that discretion to a third party. *United States v. Samuel,* 431 F.2d 610, 615 (4th Cir.1970).

A. Reasons For The Measures Should be in the Record

 The record does not contain a summary list of reasons, but nonetheless is replete with support for the judge's decision. From the outset of the resentencing hearing, he was concerned with courtroom security. The same judge had presided over the original trial and was aware of Hunt's background. He knew that Hunt had a record of violent crime [4] and that a psychiatric report indicated that Hunt had an anti-social personality. *Hunt,* 312 Md. at 505–06, 540 A.2d at 1130. At the original trial, the judge ordered enhanced security in the form of additional officers in the courtroom. *Id.* at 506, 540 A.2d at 1130. He ordered similar security at the resentencing hearing.

The judge ordered Hunt to wear leg irons during the sentencing hearing after receiving a presentencing investigation report and after hearing the testimony of Judge Angeletti, chair of the court's security committee. The report and Judge Angeletti's testimony appear in the record. When the judge issued his order, he stated: "With respect to what just transpired … I'm ordering that Mr. Hunt wear leg irons in the courtroom." Clearly, the judge based his decision on the immediately preceding record, which included Judge Angeletti's testimony recommending restraints for Hunt, as well as the presentence investigation

---

4. Appellant had been convicted of armed robbery and assault.

report. The judge also referred to the presentencing report as a key factor in reassessing the need for leg irons. He stated that the presentencing report "changes things considerably." We hold that the judge adequately indicated his reasons for ordering Hunt to wear leg irons in court.

## B. Trial Judge Did Not Delegate Discretion

 Hunt also contends that the judge relied solely on Judge Angeletti's opinion, and thus improperly delegated his discretion. The record indicates otherwise. The trial judge did not fail to exercise his discretion and did not delegate that discretion to Judge Angeletti. That the trial judge was concerned with security before consulting with Judge Angeletti is clear from the record. He had previously ordered enhanced security. In fact, he consulted with Judge Angeletti only after receiving the presentencing report. He carefully considered the security requirements throughout the proceedings, and ordered the appellant to wear leg irons only after receiving the presentencing report which added significant information on the issue, as well as hearing Judge Angeletti explain, on the record in open court, his reasons for recommending physical restraints. The trial judge did not rely solely on, nor delegate his discretion to, Judge Angeletti. The trial judge's decision to change the level of courtroom security was not mere acquiescence to a recommendation, but rather a "mature reflection based upon somewhat different conditions." *Bowers*, 306 Md. at 138, 507 A.2d at 1081.

We also note that by ordering leg irons, the judge employed a restraint obviously designed to prevent escape, but not designed to prevent acts of violence by the defendant. This is a lesser restraint than handcuffs, and accordingly, less prejudicial. The American Bar Association's *Standards for Criminal Justice* (2d Ed.1982) § 15–3.1(c), as cited in *Bowers*, 306 Md. at 129, 507 A.2d at 1076, notes in commentary that "[t]here is some authority that shackles are not to be used if the danger can be overcome by armed

guards and that handcuffs are not to be used if less visible leg irons will suffice."

 That the judge's decision to change the level of security occurred after the trial started, and after the jury had first seen Hunt without shackles, causes some concern. But because the decision was made promptly after receiving relevant new information contained in the presentence report, the judge properly exercised his discretion. Although it would be preferable that the defendant be restrained from the beginning of the trial, if at all, the judge cannot be precluded from taking appropriate security measures when new information or circumstances arise. *See State v. Weikle,* 223 Neb. 81, 388 N.W.2d 110 (1986) (no error where trial judge ordered a previously unrestrained defendant to wear leg irons during the appearance in court of inmate witnesses after the judge had heard testimony that the defendant contemplated another escape attempt).

## C. Procedural Protections

 When considering extraordinary security measures, the trial judge should employ procedural protections to minimize the possibility of prejudice to the defendant. Such procedures should include hearing any argument on the issue out of the presence of the jury, affording the defendant an opportunity to rebut, and upon request, issuing cautionary instructions to the jury or polling the jurors to determine if they would be disposed against the defendant because of the security measures. *See Bowers,* 306 Md. at 129–34, 507 A.2d at 1076–79.

 The trial judge provided adequate procedural protections. The argument was held outside the jury's presence. Hunt's counsel had the opportunity to argue against the use of physical restraints, and had the opportunity to cross-examine Judge Angeletti. Hunt did not offer any evidence to rebut the reports of prison violations. Hunt did, however, attempt to rebut the escape risk status by

arguing that he had been taken to his psychiatrist's office and to court without previous incident.

■ Hunt may have been entitled to, and the trial judge offered to give, cautionary instructions to the jury about the leg irons. The judge also offered to poll the jurors on whether they would be prejudiced by seeing Hunt in leg irons. Hunt's counsel, making a strategic decision, specifically asked that the judge do neither. Having rejected the judge's offer, Hunt cannot now complain about the failure to poll the jury or the failure to give a cautionary instruction.

## III. JURY SELECTION

Hunt contends that the trial judge erred in refusing to excuse five jurors for cause. He maintains that this forced him to exhaust all of his peremptory challenges and, as a result, one juror was seated who should have been excluded for cause. Hunt also contends that the trial judge improperly excluded one prospective juror for cause.

Hunt's objection to the five jurors not excluded for cause was that they were predisposed to vote for the death penalty (the so-called "reverse *Witherspoon*" situation). *See Spivey v. State*, 253 Ga. 187, 319 S.E.2d 420, 430 (1984), *cert. denied*, 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809 (1985). In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that a prospective juror could not be excluded for cause from a case simply because the juror expressed a general objection to the death penalty. *Id.* at 522, 88 S.Ct. at 1776–77, 20 L.Ed.2d at 785. Counsel have not cited, and we have not found any Supreme Court decisions directly involving the reverse *Witherspoon* situation, but the Court's refinements of *Witherspoon* provide guidance on the general topic of juror predisposition, albeit in the *Witherspoon* context.

The Supreme Court has held that the proper standard for determining whether a juror may be excused for cause when the juror has a predisposition against the death penal-

ty, is "whether the juror's views [on capital punishment] would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985). This standard, essentially, is that jury impartiality requires only "jurors who will conscientiously apply the law and find the facts." *Wainwright,* 469 U.S. at 423, 105 S.Ct. at 852, 83 L.Ed.2d at 851.

■ This Court applied the *Witt* standard in a *Witherspoon* situation in *Grandison v. State,* 305 Md. 685, 725, 506 A.2d 580, 600, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). We noted that the trial judge's decision would be given deference, and that the prospective juror's bias need not be proven with unmistakable clarity before the juror could be excused for cause. *Id.* We shall apply the same standards to the reverse *Witherspoon* situation. Jurors who have a bias in favor of the death penalty that would prevent or substantially impair their performance as jurors should be excused. Jurors who may have an inclination to favor the death penalty, but who would nevertheless conscientiously apply the law, need not be excused. *See State v. McDougald,* 120 N.J. 523, 577 A.2d 419, 436 (1990); *Spivey,* 319 S.E.2d at 430–31. The trial judge's factual determinations about the extent of a juror's bias must be given deference. *Grandison,* 305 Md. at 725, 506 A.2d at 600.

### A. Five Jurors Not Excluded for Cause

The trial judge gave counsel a virtually unlimited opportunity to question the individual jurors on their beliefs about the death penalty, as well as their beliefs about aggravating and mitigating circumstances. The judge also made clear that his decision to grant or deny a motion to strike would be based upon the totality of responses given by that prospective juror. The trial judge denied Hunt's motions to strike five prospective jurors who expressed an

inclination toward the death penalty. Only one of these five actually served on the jury.

### 1. Jeffrey Paull

 Prospective juror Paull testified on direct examination that his beliefs would preclude him from voting for a sentence other than death for a defendant convicted of first degree murder. On cross examination, however, he retreated from his initial statement and testified that "I think I could weigh all of those factors in my mind." He also said that "I couldn't possibly make up my mind until I heard the facts presented." These statements support the trial judge's decision that juror Paull could have performed his " 'duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt,* 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851–52 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 584 (1980). The fact that Paull's assertions were made during cross examination and that they conflicted with the answers given on direct examination is not dispositive of the issue because a prospective juror may be rehabilitated through additional questioning. *Grandison v. State,* 305 Md. at 726, 506 A.2d at 600. The trial judge did not abuse his discretion in refusing to excuse juror Paull for cause. Hunt exercised peremptory challenges to excuse Paull, as well as the next three jurors that Hunt contends should have been excused for cause.

### 2. Henry Doyle

 Prospective juror Doyle testified that he would be predisposed to vote for the death sentence based upon the defense counsel's definition of murder and particularly in the case where the victim was a police officer. But he also indicated that he believed that he could listen to the evidence, apply the law, and come to a fair verdict based solely on the evidence. In fact, juror Doyle's testimony that "each instance would be different, and based on whatever those instances, those facts were, I would make an independent

decision," was very much in keeping with the principle of individualized determination that underlies death penalty jury selection. The trial judge did not abuse his discretion in finding that Doyle could have impartially performed his duties.

### 3. Jeffrey Nesson

Prospective juror Nesson was a criminal defense lawyer. He testified that the fact that the victim was a police officer did not predispose him in favor of the death penalty, but it "certainly doesn't help." Hunt's major complaint with Nesson was his expression of unwillingness to consider voluntary use of drugs to be mitigating. When first asked about whether drug use by Hunt would be a mitigating factor, Nesson stated: "It depends on why he was using them. If it is strictly voluntary use, I don't know that it would mitigate the crime." Later in the voir dire, he stated: "[V]oluntarily taking drugs and going out and shooting someone does not mitigate [the crime] . . . I think it aggravates it, not mitigates it." He did, however, indicate that he could impose punishment in accordance with the law.

Hunt's contention seems to be that jurors should be excused for cause if they might have some bias against any unenumerated circumstance that a defendant wishes to argue ought to be mitigating. Such a contention is far beyond the *Witt* standard and we decline to apply it. The death penalty statute grants jurors the discretion to find the existence of mitigating circumstances other than the seven enumerated. A jury would not be impartial if it was composed exclusively of jurors predisposed to find as mitigating the factors or circumstances the defendant intends to argue ought to be mitigating. The statute was intended to provide jurors with the flexibility to find mitigating factors that the legislature may not have enumerated. It was not intended to guarantee the defendant a jury that always agrees with his argument as to what circumstances

ought to be mitigating. It was not error for the trial judge to refuse to excuse juror Nesson.

### 4. Joan Bodley

Prospective juror Bodley testified that she might be more inclined to impose the death penalty if she thought the defendant might be paroled in a "short time" or in "a few years." She also testified as follows:

"Q. Okay. If you hear evidence that Mr. Hunt was both addicted to drugs and, in fact, under the influence of drugs at the time this incident occurred, would you be willing to consider that evidence as a reason to not impose the death penalty or to impose a sentence of life?

A. No.

Q. You would not be willing to consider it?

A. You mean the fact that he was on drugs should get him life imprisonment instead of the death penalty? Is that what you are asking?

Q. Yes. Would you be willing to consider that evidence?

A. No."

Bodley testified that her views on the death penalty were not strong either way, and that the death penalty "could be applied in some instances and not applied in others." It was not error for the trial judge to refuse to excuse her for cause.

### 5. Diana Void

Diana Void served on the jury after the trial judge denied the defendant's motion to excuse her for cause. Her presence on the jury is crucial in our analysis because "any claim that the jury was not impartial ... must focus ... on the jurors who ultimately sat." *Ross v. Oklahoma,* 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80, 88 (1988).

Void was certainly a confused juror. This does not mean that she should have been excused for cause. Void testified

that she would vote for the death penalty in every case of murder, and every murder where a handgun was used to kill a police officer. But she then testified that she had already made up her mind to vote for a life sentence for Hunt, and would vote for a life sentence regardless of whatever information was provided during the course of the trial. She testified that it would make a difference to her that a handgun was used, but later testified that the weapon made no difference at all. She was also willing to consider many unenumerated mitigating circumstances, including evidence of prison conditions, drug use, and childhood abuse of the defendant. Ultimately, Void testified that she was willing to base her conclusion on the evidence and on the law as explained by the judge. This testimony supported the trial judge's decision to not exclude her for cause. It appears from the record that Ms. Void was somewhat confused and often inconsistent but on balance, she was not predisposed to impose the death penalty.

## B. Excused Juror

The trial judge granted the State's motion to exclude for cause prospective juror Herman Meyer. Meyer was a cousin of the attorney who represented Hunt on his first appeal. Meyer described his relationship with his cousin as "close," but he did not indicate that he knew that his cousin had represented Hunt. The prosecutor did not object to Meyer during voir dire, but later, after becoming aware that the cousin had represented Hunt, he moved to dismiss Meyer.

A trial judge should not excuse prospective jurors for cause simply because of the juror's abstract beliefs. *King v. State*, 287 Md. 530, 539, 414 A.2d 909, 913 (1980). We agree that excusing jurors for cause because of their abstract beliefs is an abuse of discretion because it "exclude[s] from the panel a significant part of the community." *Id.* But Meyer was excused not because of any abstract beliefs, but rather because of his "close" personal relationship with someone "having a strong personal interest in [the case's] outcome." *Cf. Bristow v. State*, 242 Md.

283, 285, 219 A.2d 33, 34 (1966). The judge made that clear, saying:

> "I felt that the relationship where the cousin works right on this very same brief, has [intimate] knowledge of the case and the close relationship, I felt that it was grounds for excluding this person as a juror."

It is not an abuse of discretion when the judge makes a considered decision to excuse a juror based on potential personal prejudice. It was within the judge's broad discretion to exclude Meyer.

Hunt also contends that it was error to excuse Meyer without making further inquiry of the juror. The judge was faced with a dilemma. Further inquiry might be helpful in determining whether Meyer could be impartial, but the questioning itself could have tainted the juror by informing him directly or indirectly about the prior appeal and about his cousin's representation of Hunt. The judge's failure to further interrogate Meyer was not an abuse of discretion.

 Even if the judge abused his discretion in this case, we would not hold that the abuse constituted reversible error. " '[I]t is not reversible error for the Court of its own motion to exclude a juror, *even for insufficient* cause, if an unobjectionable jury is afterwards obtained (emphasis supplied).' " *King,* 287 Md. at 538, 414 A.2d at 913 (quoting *Bluthenthal & Bickart v. May Co.,* 127 Md. 277, 285–86, 96 A. 434, 438 (1915)). This principle is applicable where, as here, the reason for excusing a juror is related to the particular juror and not to a general class of people. *Id.* The exclusion of Meyer, even if for insufficient cause, would not constitute reversible error where, as here, the jurors who were selected were not objectionable.

## IV. TESTIMONY OF AARON MCNAIR

 Hunt contends that the trial judge erred in permitting Aaron McNair, an eyewitness to Officer Adolfo's murder, to testify that he was released from prison for "protec-

tion." On cross-examination, defense counsel attempted to show that McNair had received favorable treatment from the State, including release from jail on a disorderly conduct charge unrelated to this case, in return for his testimony. On re-direct examination, when asked why he had been released from jail, McNair replied, "protection." Counsel for the defense objected, and at a bench conference, the judge told the prosecutor, "you are treading on thin ice." After defense counsel indicated his concern about where the questioning was leading, the prosecutor volunteered to go on to other matters. McNair was asked no more questions on the issue.

Hunt now argues that the jury was left with the impression that McNair was released from jail for protection from Hunt. But at trial, he did not raise the issue beyond his objection to McNair's answer. He did not ask the court to strike McNair's answer. He did not move for a mistrial. He did not ask for cautionary instructions. After the judge effectively sustained his objection by warning the prosecutor, Hunt remained silent. Hunt got everything he asked for. The trial judge did not commit error by failing to give Hunt more than he asked for. 5 McLain, *Maryland Evidence*, § 103.10 at 30 (1987).

Even if Hunt had properly and timely sought curative action, we would find no reversible error. As appellant concedes in his brief, there was no evidence that McNair's need for protection was linked to Hunt. The "naked reference" to McNair's need for protection did not prejudice Hunt. *Jones v. State*, 310 Md. 569, 588, 530 A.2d 743, 752 (1987), *sentence vacated and remanded*, 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, *sentence rev'd*, 314 Md. 111, 549 A.2d 17 (1988).

## V. TESTIMONY OF MAJOR THOMPSON

### A. Blood on Knife Recovered from Hunt

Hunt next alleges that the trial judge erred when he denied Hunt's motion for a mistrial during the testimony

of Major Hollis Thompson, Chief of Security at the Maryland Penitentiary. Major Thompson when testifying about a knife that was recovered from Hunt's cell, stated that the knife had "a lot of blood on it." Upon objection by defense counsel, the trial judge instructed the jury to disregard Major Thompson's statement about the blood, but denied Hunt's motion for a mistrial. Hunt argues that Major Thompson's testimony was so prejudicial that only mistrial could cure the damage.

"[T]he declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice." *Jones*, 310 Md. at 587, 530 A.2d at 752. This Court has recognized that granting a motion for a mistrial lies within the discretion of the trial judge. *Poole v. State*, 295 Md. 167, 183, 453 A.2d 1218, 1227 (1983). The trial judge, who hears the entire case and can weigh the danger of prejudice arising from improper testimony, is in the best position to determine if the extraordinary remedy of a mistrial is appropriate. We will not reverse a trial court's denial of a motion for mistrial unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion. *Johnson v. State*, 303 Md. 487, 516, 495 A.2d 1, 16 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986) (*Johnson II*).

We hold that Hunt was not so clearly prejudiced that the judge's denial of a mistrial constituted an abuse of discretion. There was no suggestion that Hunt had used this knife or any other weapon to assault any inmate or guard, nor is there any suggestion that, if the substance was in fact blood, it was not Hunt's. The judge took curative action when he instructed the jury to disregard Major Thompson's testimony about blood on the knife. This action of "striking the single reference" to blood on the knife in Thompson's testimony sufficiently cured any prejudice that may have occurred. *Collins*, 318 Md. at 287, 568 A.2d at 9.

B. Major Thompson's Opinion of Hunt's Dangerousness

 Hunt contends that the trial judge erred in admitting Major Thompson's opinion that Hunt was "dangerous." After Major Thompson had testified about Hunt's behavior in prison and about prison disciplinary procedures, he testified as follows:

[STATE'S ATTORNEY]: "Have you made a decision about Flint Gregory Hunt?

A. Yes.

Q. What do you consider him?

A. Oh, he's dangerous. He's dangerous.

[DEFENSE ATTORNEY]: Objection, Your Honor.

THE COURT: Overruled."

Hunt's only contention on appeal is that there was no "evidentiary basis" for Major Thompson's opinion on this issue.

We initially point out that once again Hunt's attorney merely objected to the answer. He did not ask the court to strike the testimony, did not move for a mistrial, and did not ask for a cautionary instruction. Even if Hunt had sought curative action, we would find no reversible error. Hunt's contention on appeal is not that the opinion was improper, but that Major Thompson was not competent to express the opinion. Hunt acknowledges that the opinion was "related to an important mitigating factor."

A witness must have an adequate basis for an opinion about the character of another before the opinion may be admitted into evidence. *Durkin v. State*, 284 Md. 445, 453, 397 A.2d 600, 605 (1979). The trial judge determines whether the witness satisfies this requirement, and the judge's determination will not be overturned absent a clear abuse of discretion. *Id.*

The jury heard a great deal of evidence on the issue of Hunt's "dangerousness." Mitigating circumstances number 7 was "[i]t is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society." Hunt called as a witness Gordon Kam-

ka, the former Secretary for Public Safety. Mr. Kamka was questioned about his opinion as to whether or not Hunt would be a danger within the institution.

"Q. Do you have an opinion, sir, as an expert in correctional administration whether Mr. Hunt is a danger in the institution?

A. I do have an opinion.

Q. Can you tell the ladies and gentlemen of the jury what that is?

A. I don't believe he is a danger inside the institution. He is a problem to the correctional staff, in that he has a number of disciplinary reports, a number of tickets, is what we call them, but I see no indication that he is any particular danger to himself or to other people. A problem, yes; irritant, yes; danger, in my opinion, no."

The trial judge did not abuse his discretion by determining that Major Thompson had an adequate basis for forming an opinion about Hunt's dangerousness. Certainly, Major Thompson was as qualified as defense witness Kamka. Mr. Kamka met Hunt once, and reviewed his records. Major Thompson had 16 years of experience as a correctional officer. He was Chief of Security for the Maryland Penitentiary. As a security officer, he was aware of Hunt's many infractions in the penitentiary. Major Thompson received reports on Hunt's violations of the rule prohibiting possession of weapons. He knew that Hunt was placed in segregation status for those violations. Major Thompson's testimony was specifically about Hunt's dangerousness in the prison, not Hunt's general capacity for dangerousness. Major Thompson was qualified to form and offer an opinion on the subject.

## VI. ADMISSION OF THE VICTIM'S EFFECTS

 The State introduced into evidence Officer Adolfo's ballistic vest, police revolver, police uniform buttons, holster, gun belt, walkie talkie, and tie. Hunt argues that the

State introduced this evidence to induce an emotional response and that the evidence lacked any relevance to any issues before the jury. He contends that the trial judge committed reversible error by admitting the evidence.

All evidence must pass a threshold test of relevance and the judge must determine whether or not evidence is relevant. *Id.* Officer Adolfo's police effects pass the threshold of relevance. They tend to establish that Officer Adolfo was clearly and obviously a police officer who was in uniform and performing his duties when murdered. This was relevant to establish one of the aggravating factors required for the jury to sentence a defendant to death. Maryland Code (1957, 1987 Repl.Vol.), Article 27, § 413(d)(1) lists as an aggravating circumstance: "The victim was a law enforcement officer who was murdered while in the performance of his duties." Also, the evidence tended to corroborate oral testimony about the incident. The vest showed the location of the bullet holes. Officer Adolfo's gun was fully loaded, thereby corroborating testimony that the officer never fired his weapon at Hunt. Whether used to establish the aggravating circumstance or to corroborate testimony about how the incident transpired, Officer Adolfo's police effects were relevant.

Even relevant evidence may be excluded if its prejudicial effect substantially outweighs its probative value. *Hunt,* 312 Md. at 504, 540 A.2d at 1130.[5] A trial judge's decision to admit relevant evidence over an objection that the evidence is unfairly prejudicial will not be overturned absent an abuse of discretion. *Bedford v. State,* 317 Md. 659, 676–77, 566 A.2d 111, 119–20 (1989). In the case at bar, the trial judge did not abuse his discretion.

---

**5.** This Court found that a tape recording of Officer Adolfo's voice played at the guilt/innocence phase of Hunt's trial was not unfairly prejudicial. *Hunt v. State,* 312 Md. 494, 503–04, 540 A.2d 1125, 1129–30 (1988). If a tape recording of the victim's voice made immediately before his death is not likely to create such an emotional atmosphere as to unfairly prejudice the defendant, then admission of physical evidence should not do so.

Hunt also objected to the introduction of Officer Adolfo's personal effects based on his speculative claim that the Officer's family would react emotionally in the courtroom and, thus, influence the jury. Other than defense counsel's bench conference claim that the family members had tears in their eyes, the record shows no hint of emotional outbursts by the Adolfo family. The trial judge, who is responsible for maintaining courtroom decorum, observed that the family was composed. Thus, Hunt's hypothesized scenario never came to pass. Hunt suffered no prejudice, and the trial judge did not err.

## VII. DR. BALSTER'S TESTIMONY

Hunt contends that the trial judge erred in allowing the prosecutor to cross-examine Dr. Robert Balster using the transcript of the testimony of Dr. Edward French, who testified for Hunt during the guilt/innocence trial. Both doctors testified about the effects of ingesting PCP to support Hunt's claim that he was substantially impaired as a result of taking the drug.

On cross-examination, Dr. Balster acknowledged that he was familiar with Dr. French. The prosecutor then asked Dr. Balster if he agreed with several opinions given by Dr. French at the guilt/innocence trial. The opinions included that PCP affects different people in different ways, and that a person impaired by PCP would probably not have the judgment or ability to improve his driving when he realized that he was being followed by a police car. Dr. Balster agreed with the opinions. The prosecutor then asked, hypothetically, if it would be a demonstration of good judgment for a person to change from bad driving to good driving if followed by a police car. Dr. Balster answered that it would demonstrate good judgment. Hunt argues that the cross-examination elicited "expert testimony regarding facts contrary to those adduced at trial," and that Dr. Balster could not be impeached by Dr. French's previous testimony.

The allowance of questions on cross-examination of a witness is left to the discretion of the trial judge, and will not be overturned absent an abuse of discretion. *See Trimble v. State,* 300 Md. 387, 401, 478 A.2d 1143, 1150, *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1984); *Williams v. Graff,* 194 Md. 516, 522–23, 71 A.2d 450, 452–53 (1950); *DeLilly v. State,* 11 Md.App. 676, 681, 276 A.2d 417, 419 (1971). One purpose of cross-examination is to elicit a full explanation of facts testified to on direct examination. By placing the testimony of a witness in its proper setting, the cross-examiner helps the jury to better appraise the testimony. *DeLilly* at 681, 276 A.2d at 419; *Smith v. Illinois,* 390 U.S. 129, 132, 88 S.Ct. 748, 750, 19 L.Ed.2d 956, 959 (1968). Clearly that was the prosecutor's intention. On direct examination, Hunt attempted to show how PCP impairs judgment and mental ability as support for his contention that his crime was mitigated by his use of PCP. The prosecutor attempted to place this testimony in its proper setting by showing that a person who commits a violent act while using PCP could possibly commit the same act without using PCP. The prosecutor also elicited on cross-examination that one intoxicated by PCP would likely lack the judgment or ability to drive lawfully, the way that Hunt did, when followed by a police car.[6] Thus, while Dr. Balster testified on direct examination that PCP impairs judgment, he agreed on cross-examination that one using PCP would likely lack the judgment to drive as Hunt drove when followed by Officer Adolfo.

Hunt also contends that asking Dr. Balster the hypothetical question about the judgment of a person followed by a police car was contrary to facts adduced at trial. The record shows otherwise. The tape recording of Officer Adolfo's radio transmissions indicated that Hunt was not violating traffic laws. Hunt offered evidence that he had

---

6. The prosecutor introduced into evidence a tape recording of Officer Adolfo's reports on his police radio that the driver he was following (Hunt) had not violated any traffic laws.

used PCP. The tape indicated that Officer Adolfo followed Hunt for at least five minutes before Hunt stopped. It seems likely that Hunt was aware he was being followed and drove lawfully to avoid suspicion. Thus, the hypothetical was consistent with the facts adduced at trial.

 Hunt's contention that the trial judge improperly allowed the questions regarding Dr. French's testimony to impeach Dr. Balster is meritless. The prosecutor did not seek to impeach Dr. Balster's testimony; rather, he sought to place it in its proper setting, and to determine whether the witness agreed with the State's position. Dr. Balster admitted that he was unfamiliar with the facts of the case and that he had never met Hunt. The prosecutor merely sought to elicit Dr. Balster's opinions about the general effects of PCP in the context of Hunt's specific behavior when allegedly intoxicated by the drug.

## VIII. PAROLE STATISTICS

 Hunt next contends that the trial judge erred in refusing to admit into evidence a report of the number of inmates serving life sentences in Maryland who were released from the penitentiary in certain specific years. Hunt wanted to have an official from the Division of Correction's statistical section testify to the number of "lifers" released each year from 1984 to 1988, although he was prepared to agree to limit the testimony to 1986 to 1988, the years Hunt had spent in prison.

At one time, this Court did not allow the introduction during a death penalty proceeding of any evidence regarding the possibility of parole. *Harris V*, 312 Md. at 250–51, 539 A.2d at 649. We modified that position in *Doering*, 313 Md. at 411–12, 545 A.2d at 1295. In *Doering* we held that a "defendant in a capital sentencing proceeding ... [may] place before the jury *relevant* and competent information concerning his eligibility for parole in the event a life sentence is imposed...." *Id.* (Emphasis added). The underlying rationale in *Doering* was that the availability of an

acceptable alternative sentence to death could be a mitigating factor in the jury's deliberations, and the defendant should have the benefit of having the jury consider the alternative sentence with a better understanding of the legal and practical effects of a life sentence.[7] *Cf. California v. Ramos,* 463 U.S. 992, 1001, 103 S.Ct. 3446, 3453, 77 L.Ed.2d 1171, 1180–81 (1983) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 990 (1978) (plurality opinion)).

At the same time, we made clear in *Doering* that not all information regarding parole is admissible. We noted that predictions of a specific parole computation date would not be admissible because such predictions would require too much speculation, and that the threshold requirements of relevance and competency apply to evidence regarding the possibility of parole as they do to all evidence. *Doering,* 313 Md. at 412, 545 A.2d at 1295.

"[T]o be admissible the proffered evidence must meet a threshold test of relevancy." *Johnson II,* 303 Md. at 527, 495 A.2d at 21. We do not find that the trial judge committed error in excluding the proffered evidence. The evidence referred to *all* inmates serving life sentences in the Maryland corrections system for the years in question. It did not distinguish among the various crimes for which those inmates were convicted, let alone the circumstances of each case. It did not distinguish among the background of the inmates involved. The bald numbers gave no clue about the prison behavior records of the inmates released and those denied release. The written report, to which the Department of Corrections official was prepared to testify, noted that the average term of imprisonment for those released was about 20 years, but also noted that many prisoners serving life sentences were never released. In

---

7. Hunt was not eligible for a sentence of life without possibility of parole, as provided for in Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 413, because the crime for which he had been convicted was committed before the Maryland law was amended to provide for such a sentence.

summary, the proffered evidence probably would not have helped the jury understand the "legal and practical effects" of a life sentence.

We note that Hunt had admitted into evidence other "relevant and competent" information about the "legal and practical" effects of parole. The jury learned that Hunt would have to serve a minimum of 25 years, less good conduct time, for the murder should the jury sentence him to life in prison. This information, while universally applicable to those serving life sentences, was also particular to Hunt. But when any particular inmate will be paroled is an individualized determination. A simple listing of how many inmates have been paroled annually, standing alone, adds nothing to the jury's understanding of when any particular defendant will be paroled. The trial judge did not err in excluding this evidence.

## IX. PRESENTENCE INVESTIGATION REPORT

Hunt contends that the trial judge erred in admitting certain parts of the presentence investigation report, as well as physical evidence corroborating information contained in the presentence report. Hunt objected to the admission of two letters written by him to another inmate and seized by prison guards. In one letter, Hunt wrote that he had feigned an illness to go to University Hospital "so I could see what my chances were for freedom." In another letter Hunt wrote, "I ... went down to the hospital—I was trying their hand but apparently my idea didn't go so well because I'm still here." He objected to the admission of prison infraction reports which detailed his violations of prison rules forbidding inmates from possessing weapons. Finally, he objected to the admission of the weapons themselves, two homemade knives found in Hunt's possession.

"Article 27, § 413(c)(iv) expressly provides that 'any presentence investigation report' is admissible in a capital sentencing proceeding." *Collins*, 318 Md. at 294, 568 A.2d at 13. The defendant's prior institutional history is an

important part of such a report because it provides an indication of the defendant's adjustment to prison life. His adjustment may be a consideration for the jury when it decides the appropriateness of the death penalty. A defendant's institutional conduct after an offense has been committed may provide the jury with a better understanding of the defendant and the appropriate sentence. *Huffington v. State,* 304 Md. 559, 577–78, 500 A.2d 272, 281 (1985), *cert. denied,* 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986) (quoting *Bartholomey v. State,* 267 Md. 175, 297 A.2d 696 (1972)). For example, the defendant's ability to adjust may relate to his future dangerousness, both in and out of prison. *Cf. Evans v. State,* 304 Md. 487, 530, 499 A.2d 1261, 1283 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986), where we pointed out, "one might be likely to engage in criminal activity constituting a threat to those around him whether he is confined in a penal institution or on parole."

We have declined to find reversible error in several cases where defendants have challenged the admission of presentence investigation report references to institutional conduct. *See Collins,* 318 Md. at 294–95, 568 A.2d at 13–14 (report of defendant's institutional infractions of "being out of bounds," "lateness," and "disobedience" was admissible); *State v. Calhoun,* 306 Md. 692, 725–29, 511 A.2d 461, 477–79 (1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987) (defendant's spraying of contents of a bottle, apparently containing a mixture of human waste, on a correctional officer was admissible); *Huffington,* 304 Md. at 577, 500 A.2d at 281 (not error to allow admission of defendant's infractions for refusing to obey a direct order and creating a security threat).

In *Collins,* we noted that "[t]he only [statutory] limit placed upon the admissibility of presentence investigation reports is in reference to 'any recommendation as to sentence contained in the report.'" *Id.* at 295, 568 A.2d at 14 (quoting Art. 27 § 413). Therefore, reliable information contained in a presentence investigation report, which is of

probative value and relevant to sentencing, ordinarily is admissible provided the defendant is accorded a fair opportunity to rebut any statements. The information in the presentence report about Hunt's misconduct while incarcerated was reliable and relevant.

## A. The Escape Letters

Hunt maintains that the letters should not have been admitted because his actions did not amount to a substantial step toward escape. He relies on *Bedford v. State*, 317 Md. 659, 566 A.2d 111 (1989). In *Bedford*, an inmate *awaiting trial* for murder was discovered possessing a four inch piece of metal wire sharpened to a point. The trial judge admitted this into evidence upon the State's contention that this supported an inference that the defendant planned to escape. The State maintained that this was admissible as evidence of a consciousness of guilt. We reversed, holding that:

> "If the judge finds that the proposed material is likely to lead a reasonable jury to infer the defendant's guilt without causing him substantial prejudice, then the judge may allow the jury to consider the evidence in reaching a verdict as to the charged offense. If, however, the inference as to ultimate guilt is weak and the circumstantial evidence merely tends to create in the minds of the jurors the impression that the defendant is of questionable character and has a propensity for bad acts and probably acted accordingly on the charged occasion, then the evidence should be excluded."

*Id.* at 668, 566 A.2d at 115. We went on to note that evidence which tended merely to show that the defendant was a "bad man" was not admissible to prove his guilt. *Id.*

Hunt's situation is distinguishable from Bedford's. Hunt stood before the court as a convicted murderer, not as an accused defendant entitled to the presumption of innocence. While irrelevant to the guilt/innocence phase of a criminal trial, Hunt's "dangerousness," as exemplified by his past conduct, was relevant in the sentencing phase of the trial.

The State did not offer the presentence investigation report of Hunt's prison conduct and Hunt's letters as proof of Hunt's consciousness of guilt. Rather, the report and its accompanying exhibits were admissible pursuant to Art. 27, § 413(c)(iv). They were also admissible to rebut the potential mitigating factor of lack of future dangerousness as evidenced by his escape plans. We also note that Hunt offered the same letters into evidence as attachments to an exhibit later in the trial. He introduced the exhibit including the letters and noted that he was not charged with violating prison rules. "[T]he general rule [is] that a party waives his objection to testimony by subsequently offering testimony on the same matter." *Peisner v. State,* 236 Md. 137, 144, 202 A.2d 585, 589 (1964), *cert. denied,* 379 U.S. 1001, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965).

### B. Uncharged Criminal Conduct

■ Hunt claims that both the escape letters and the weapons infractions reports involved unadjudicated criminal conduct and should not have been admitted. He relies on *Scott v. State,* 297 Md. 235, 465 A.2d 1126 (1983). In *Scott,* the trial judge admitted evidence of two unrelated murders for which there were neither convictions nor pleas of guilty or nolo contendere at the defendant's death penalty sentencing hearing. We reversed, holding that:

> "[I]n light of the State's closing argument and the trial court's instructions, the admission of this evidence may well have resulted in the mitigating circumstance of the absence of prior convictions being outweighed or, in essence, 'wiped out' or eliminated. Because this inadmissible evidence was significantly prejudicial to the accused, its admission constituted reversible error."

*Id.* at 252–53, 465 A.2d at 1136.

Hunt does not come under the umbrella of *Scott. Scott* involved criminal conduct outside of the prison setting. There is simply no comparison between the admission of a reliable report of prison conduct, which concededly occurred, and the admission of unadjudicated murder charges.

The relevant reliable information about Hunt's institutional misconduct was admissible.

## C. Introduction of the Weapons

Hunt also argues that even if the reference to the weapons in the presentence investigation was proper, "the presentation of the actual weapons to the jury was improper because whatever proper probative value the information had was satisfied by describing their recovery from [Hunt's] possession. There was no need to inflame the jury by presenting the actual knives to them." Because the actual weapons clarified and communicated facts to the jury more accurately than the mere words of the presentence report, we find no reversible error. *See Bedford v. State,* 317 Md. at 676, 566 A.2d at 119. It was well within the trial judge's discretion to find that jurors may not have understood how a weapon might be formed from the metal portion of a light fixture, and that the probative value of the physical evidence outweighed any prejudicial effect it might have to unduly influence the jury.

## X. PROSECUTOR'S CLOSING ARGUMENT

Hunt contends that the prosecutor's closing argument and rebuttal require reversal. He cites: 1) The prosecutor, referring to the defendant's allocution, stated "it is worthless, it is trash, it is an attempt to manipulate you ..., it is insulting, it is demeaning, ... written by God knows who ..."; 2) the prosecutor's remarks about the legislature not specifically enumerating the mitigating circumstances Hunt sought to establish; and 3) the prosecutor's comment, interrupted by objection and left incomplete, that "the law does not let me tell you...."

A prosecutor has wide latitude in presenting a closing argument. *Jones v. State,* 310 Md. at 580, 530 A.2d at 748. The prosecutor is free to speak harshly and engage in "oratorical conceit or flourish and in illustrations and metaphorical allusions." *Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707, 714 (1974).

At the same time, the prosecutor's freedom to argue has some limits in order to protect the defendant's fundamental right to a fair trial. For example, the prosecutor should not: make remarks calculated to inflame the jury and prejudice the defendant, *Newton v. State*, 147 Md. 71, 92, 127 A. 123, 132 (1924); comment on matters not in evidence, *Jones*, 310 Md. at 580, 530 A.2d at 748; *Toomer v. State*, 112 Md. 285, 292–93, 76 A. 118, 122 (1910); or infer that the defense counsel suborned perjury or fabricated a defense, *Reidy v. State*, 8 Md.App. 169, 172–79, 259 A.2d 66, 68–71 (1969). But not every improper remark by a prosecutor necessarily requires a reversal. *Jones*, 310 Md. at 580, 530 A.2d at 748.

Determining whether a prosecutor has crossed the line separating "oratorical conceit" from prosecutorial misconduct is initially within the discretion of the trial judge and should depend upon the facts of each case. *Holbrook v. State*, 6 Md.App. 265, 268–69, 250 A.2d 904, 906 (1969). "The permissible scope of closing argument is a matter left to the sound discretion of the trial court. The exercise of that discretion will not constitute reversible error unless clearly abused and prejudicial to the accused." *Booth v. State*, 306 Md. 172, 210–11, 507 A.2d 1098, 1118, *vacated in part*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

### A. Prosecutor's Comments on Hunt's Allocution

A defendant in a death penalty sentencing proceeding may give an allocution to the jury. Maryland Rule 4–343(d). An allocution is the defendant's opportunity to give an unsworn statement to the jury, without the danger of cross-examination. *Booth*, 306 Md. at 198, 507 A.2d at 1111. The jury may consider the allocution and find the existence of a mitigating factor based upon it. *Id.* at 198–99, 507 A.2d at 1111–12. While denied the opportunity to cross examine the defendant, the prosecutor may comment upon the allocution. In *Booth* we held that an allocution is more like testimony than silence, and that the defendant waives any privilege against comment by the prosecu-

tor. We further held that the prosecutor is free to tell the jury that they *should not* consider the defendant's allocution; however, the prosecutor is not free to tell the jury that they *could not* consider the allocution. *Booth*, 306 Md. at 199, 507 A.2d at 1112.

■ The prosecutor's remarks came close to, but did not cross the line. They were a strong suggestion that the jury *should not* consider Hunt's allocution rather than an argument that they *could not* consider Hunt's allocution. We cannot say that the trial judge committed reversible error when he overruled Hunt's objection. *Collins*, 318 Md. at 279 n. 7, 568 A.2d at 5 n. 7. *See also Donnelly v. DeChristoforo*, 416 U.S. 637, 645–46, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431, 438 (1974). We note, however, that the prosecutor could have expressed his argument in more appropriate terms. "The duty of the prosecutor is to seek justice, not merely to convict." 1 *ABA Standards for Criminal Justice*, § 3–1.1(c).

### B. Prosecutor's Comment on Authorship of the Allocution

■ Hunt read his allocution from a prepared text. The prosecutor commented that Hunt's allocution was "written by God knows who." Hunt argues that this constituted an unfair implication that his attorney wrote the allocution. Citing *Reidy*, Hunt claims that this unfairly prejudiced him. In *Reidy*, the Court of Special Appeals reversed a conviction where the prosecutor argued that the defendant's claim of self defense was "a fiction manufactured by defense counsel." *Reidy*, 8 Md.App. at 172, 259 A.2d at 68.

The court did not err in overruling Hunt's objection to the prosecutor's comment on the prewritten allocution. The comment was ambiguous. In the instant case, unlike *Reidy*, the prosecutor was not suggesting that Hunt committed perjury and that his counsel suborned perjury. Instead, he was commenting on the use of a prepared script and the fact that Hunt might have had assistance in its

preparation. We hold that it was within the trial judge's discretion to allow the comment.

### C. Prosecutor's Comments on Non–Statutory Mitigating Factors

 Hunt maintains that the prosecutor improperly implied that the jury should give less weight to unenumerated mitigating circumstances than to those enumerated in the Maryland death penalty statute. The statute lists seven mitigating factors, but provides an eighth category for any other factors that the jury may find to be mitigating. The prosecutor argued to the jury that Hunt sought to establish the "standard list of mitigating circumstances" used by many defendants in criminal cases. A fair summary of the prosecutor's argument is that almost all defendants blame their crimes on a bad childhood, drugs, and social conditions, and expect consideration for having close family ties.

Hunt contends that he was prejudiced because the prosecutor's argument "encouraged the jury to diminish its role in the death penalty process and leave the responsibility for the death sentence to the legislature's alleged judgment regarding how mitigating circumstances should be considered." We find no merit in this contention. To find a circumstance to be mitigating under section 413(g)(8), the jury must find 1) that the circumstance existed, and 2) that it was mitigating. *Foster*, 304 Md. at 482, 499 A.2d at 1258. Such circumstances are peculiar to each case, and the jury is not obligated to find their mere existence to be mitigating. Just as Hunt is free to offer anything about himself or his crime as a potential mitigating circumstance, the prosecutor is free to argue that the jury should not find the facts or circumstances suggested by Hunt to be mitigating circumstances. The prosecutor's comments do not suggest that the legislature intended or that there should be any qualitative distinction between the first seven enumerated mitigating factors and the eighth "any other" mitigating factor. Rather, a fair reading of the challenged comments, in the context in which they were made, discloses that they

were directed to the issue of whether the jury should find Hunt's background, exposure to drugs, and relationship with his family to be mitigating circumstances. He argued that even if the jury believed Hunt's explanations and excuses for his behavior, it nevertheless should find these factors not to be mitigating. This was permissible argument. *Doering*, 313 Md. at 412–13, 545 A.2d at 1295–96.

### D. Prosecutor's Comment that "the law does not let me tell you"

We also find no merit in Hunt's last contention. The prosecutor's unfinished statement that "the law does not let me tell you ..." is ambiguous on its face. From the record it is unclear whether the prosecutor was hinting that the law prevented him from telling the jury about things which would convince them to impose the death penalty, or rather was merely using the phrase as a rhetorical device. The trial judge acted properly to prevent the prosecutor from taking the comment into improper areas. After a bench conference out of the jury's hearing, he directed the prosecutor to move on to other areas. Hunt did not ask that the interrupted comment be stricken or that a curative instruction be given, suggesting that his objection was in anticipation of what the prosecutor might have said, not what he had said. There was no reversible error.

## XI. HUNT'S ALLOCUTION

Hunt contends that his allocution was denigrated by the trial judge. He complains of the judge's: instructions to the jury regarding allocution, refusal to lift the sequestration order to allow Hunt's relatives to be present during allocution, failure to allow Hunt to give his allocution from the witness stand, and failure to sustain Hunt's objections to the prosecutor's closing argument. Having already rejected the last contention, we will address only the first three.

## A. Judge's Instructions

 We addressed the issue of a trial judge's instructions concerning a defendant's allocution in *Harris V*, wherein the trial court had instructed the jury as follows concerning the defendant's right of allocution:

"A Defendant has a common law right of allocution, i.e., to address the sentencing body in mitigation of punishment, however, his statement in allocution is not evidence or testimony. During allocution the Defendant is not under oath, and thus not subject to the penalties of perjury and to cross-examination.

Any statement Jackie Harris makes to you should not be regarded as evidence but rather as his statement in mitigation of punishment."

*Harris V*, 312 Md. at 254, 539 A.2d at 651. We reversed because the instructions "in effect told the jury that it should disregard any facts stated during allocution, because those facts were not evidence or testimony. This is so because the sentencing jury was previously instructed that it was 'to decide the case only on ... evidence.'" We further noted that the instructions told the jury that "they should not heed the ... precept" that "statements made at allocution may not be disregarded merely because they were not under oath." *Id.*, 312 Md. at 254–55, 539 A.2d at 651.

The court in the instant case initially instructed the jury on allocution as follows:

"Now, Mr. Hunt has presented a statement before you which is called an allocution. A defendant has a right of allocution, that is, to address the sentencing body in mitigation of punishment. His statement in allocution is not under oath and is not subject to the penalty of perjury and cross-examination. It is his opportunity to explain to you, in his own words, anything about the crime, his feelings regarding his conduct and any other matter which he wishes to bring to your attention in considering his sentence. You may consider his allocution and it may be a basis for establishing mitigating circumstances in

imposing a life sentence. You must each, individually, accord whatever weight you deem appropriate in deciding the proper sentence for Mr. Hunt."

During deliberations, the jury sent a note to the judge. In response to the note, the judge reinstructed the jury and included the following on allocution:

"Mr. Foreman and ladies and gentlemen, I have been asked to further explain to you, in section three, you must analyze all of the evidence presented and Mr. Hunt's allocution and determine if any mitigating circumstances have been proven.

Now, I just mentioned allocution. Mr. Hunt has presented the statement before you which is called an allocution. The defendant has a right of allocution, that is, to address the sentencing body in mitigation of punishment. His statement in allocution *is not evidence or testimony.* During the allocution, the defendant is not under oath and thus not subject to the penalty of perjury and cross-examination. It is his opportunity to explain to you, in his own words, anything about the crime, his feelings regarding his conduct and any other matter which he wishes to bring to your attention in considering his sentence. You may consider his allocution and it may be a basis for establishing mitigating circumstances in imposing a life sentence. You must each individually accord it whatever weight you deem it appropriate, in determining the proper sentence for Mr. Hunt." (Emphasis added.)

Hunt does not claim that the judge's instructions were erroneous, but instead he complains that "[t]he combined effect of the [instructions] and the prosecutor's arguments had the effect of denigrating [his] allocution." He contends that the instructions as a whole, and particularly the addition in the reinstructions that allocution "is not evidence or testimony" when taken in conjunction with the closing arguments of the prosecutor, improperly encouraged the jury to disregard his allocution. We disagree.

The instructions do not misstate the law on mitigation or allocution. While the court should not have told the jury that "allocution is not evidence or testimony," the error was harmless beyond a reasonable doubt. It was made clear to the jury that "allocution may be the basis for establishing mitigating circumstances," and contrary to Hunt's assertion, the instructions did not "improperly encourage the jury to disregard [Hunt's] allocution." These instructions left the jury "free to find as a mitigating circumstance such aspect of the content of [Hunt's] allocution ... simply by specifically setting it forth on the sentencing form." *Booth v. State,* 306 Md. at 199, 507 A.2d at 1112.

### B. Allocution not Given from Witness Stand

■ Hunt contends that his allocution was denigrated because it was given from the defendant's table instead of the witness stand. The record does not reflect that Hunt expressly requested to give his allocution from the witness stand; but even if he had, since allocution is not given under oath, the trial judge could have properly denied such a request.

### C. Sequestration of Hunt's Family

■ Finally, Hunt contends that his allocution was denigrated because his family was not allowed to be present. They were witnesses at the sentencing hearing and were subject to a sequestration order. The trial judge denied Hunt's motion to lift the sequestration order so that his family could attend his allocution.

"The conduct of criminal trials falls within the sound discretion of the trial judge which will not be disturbed absent a clear abuse of discretion." *Hunt,* 312 Md. at 500, 540 A.2d at 1128. Two of the four members of Hunt's family had broken down in tears during their testimony. The trial judge was in the best position to determine if allowing the family members into the courtroom would have caused a disturbance or have impacted on security. *Cf. Hunt,* 312 Md. at 501, 540 A.2d at 1128.

Furthermore, failure to allow the witnesses into the courtroom, if error, was harmless error. There is no reason to believe that his family's presence would somehow have lent additional weight or credibility to Hunt's allocution or that their absence would have the opposite effect.

## XII. JURY INSTRUCTIONS

Finally, Hunt maintains that the judge erred in refusing to give certain requested instructions. Hunt wanted the judge to instruct the jury that the State had to prove beyond a reasonable doubt that he committed a first degree premeditated murder. He also wanted the jury instructed regarding second degree murder. Lastly, Hunt argues that the judge should have instructed the jury:

"In several places on the sentencing form the instructions tell you to enter life imprisonment. In others it tells you to enter death. Where the form instructs you to enter life imprisonment, in accordance with those instructions, the law requires you to do so. It is mandatory.

However, where the form instructs you to enter death you are not required to do so unless convinced by a preponderance of the evidence that death is the appropriate sentence under the totality of the circumstances as presented to you in this case. The fact that death is inappropriate for any reason is a sufficient mitigating circumstance."

Hunt argues that this instruction was necessary to prevent the death penalty from becoming mandatory.

"[A] trial judge must give a requested instruction that correctly states the applicable law and that has not been fairly covered in instructions actually given." *Mack v. State*, 300 Md. 583, 592, 479 A.2d 1344, 1348 (1984). In *Mack*, we went on to describe how this Court would determine whether the trial judge should have given a requested instruction.

"In deciding whether the trial court was required to give such an instruction, we must determine whether the

requested instruction constitutes a correct statement of the law; whether it is applicable under the facts and circumstances of this case; and whether it has been fairly covered in the instructions actually given."

*Id.*

■ Hunt's requested instructions on first and second degree murder fail the test of applicability. The sentencing jury should not readjudicate Hunt's murder conviction. Hunt's requested murder instructions were applicable to a guilt or innocence trial, but not to a sentencing hearing. The judge did not err in refusing to give them. Hunt received as much as, and perhaps more than, he was entitled to when the judge defined premeditation and deliberation and instructed the jurors that they "may consider as mitigating circumstances whether or not this killing was premeditated and deliberate."

■ We also reject Hunt's contention that his proposed instruction was required. Hunt argues that the sentencing form unconstitutionally makes the death penalty "mandatory" because it indicates that the jury should enter "death" as the sentence if it finds that the aggravating circumstances outweigh the mitigating circumstances. We rejected a similar contention in *State v. Tichnell*, 306 Md. 428, 467, 509 A.2d 1179, 1199 (1986) (*Tichnell IV*); accord *State v. Calhoun*, 306 Md. at 739, 511 A.2d at 485.

The Supreme Court addressed this issue recently in *Blystone v. Pennsylvania*, 494 U.S. ——, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). The Court upheld the Pennsylvania death penalty statute which provided that " '[t]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.' " *Id.* at ——, 110 S.Ct. at 1081, 108 L.Ed.2d at 261 (quoting 42 Pa.Cons.Stat. § 9711(d)(6) (1988)). Addressing whether the provision unconstitutionally mandated the death sentence, the Court said:

"Death is not automatically imposed upon conviction for certain types of murder. It is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances. This is sufficient under *Lockett* and *Pendry*."

*Id.* at ——, 110 S.Ct. at 1082–83, 108 L.Ed.2d at 263.

The Maryland death penalty sentencing form, set forth in Maryland Rule 4–343(e), is essentially identical to the Pennsylvania statute. It provides that the jury enter "death" under the same circumstances as the Pennsylvania statute. Hunt's requested instruction was not "necessary to prevent the Maryland death sentence form from unconstitutionally mandating the death penalty."

## XIII. CONSTITUTIONALITY OF RESENTENCING PROCEEDINGS

Hunt contends that the Maryland death penalty statute is unconstitutional when applied in a resentencing proceeding. He maintains that the statute and the forms used in death penalty proceedings are designed for cases where the same jury that decides the guilt of the defendant also decides the sentence. He argues that the resentencing proceeding violates the Supreme Court's ruling that a sentencing body may not be led to believe that it is not ultimately responsible for determining a sentence of death. *See Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). He reasons that there is a "possibility that the defendant will be given a sentence of death merely because one tribunal has already found him guilty."

A. Constitutionality of Resentencing Proceedings

Hunt's contention that the Maryland statute is designed for cases where the same jury decides both the defendant's guilt and the defendant's sentence is without merit. The statute expressly provides for a separate sentencing proceeding to be conducted before a second jury impaneled for that purpose if the jury that determined the

defendant's guilt has been discharged for good cause or if the defendant's original sentence was remanded by a court of competent jurisdiction. Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 413(b)(iii) and (iv). This Court has acknowledged the validity of resentencing proceedings.[8] *See State v. Colvin,* 314 Md. 1, 18–19, 548 A.2d 506, 514–15 (1988); *Harris V,* 312 Md. at 240, 539 A.2d at 644; *Tichnell v. State,* 290 Md. 43, 60, 427 A.2d 991, 999 (1981) (*Tichnell II* ). The Supreme Court has done the same. *Franklin v. Lynaugh,* 487 U.S. 164, 173 n. 6, 108 S.Ct. 2320, 2327 n. 6, 101 L.Ed.2d 155, 165 n. 6 (1988) (citing *Hitchcock v. Dugger,* 481 U.S. 393, 399, 107 S.Ct. 1821, 1825, 95 L.Ed.2d 347, 353 (1987)). There is nothing inherently unconstitutional about resentencing proceedings with a different jury after the discharge of the jury that determined the defendant's guilt.

## B. Effect of the Guilt or Innocence Trial

Hunt argues that the prior existence of a first degree murder conviction unconstitutionally usurps the resentencing jury's role because it irrefutably establishes an aggravating factor. There is no merit to Hunt's claim that the State is partially relieved of its burden of proof because the two aggravating circumstances relied on here by the State required the jury to find that "[t]he victim was a law enforcement officer who was *murdered* while in the performance of his duties" and that "[t]he defendant committed the *murder* in the furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention ... by a law enforcement officer." Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 413(d)(1) and (3) (emphasis supplied). It is true that the sentencing jury may not readjudicate the finding of the guilt/innocence phase jury that the defendant committed a murder in the first degree.

---

**8.** In fact, this Court recognized the validity of a third resentencing proceeding in *Tichnell v. State,* 297 Md. 432, 441, 468 A.2d 1, 5 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (*Tichnell III* ) and a fourth resentencing proceeding in *Harris v. State,* 312 Md. 225, 237, 539 A.2d 637, 642 (1988) (*Harris V* ).

*State v. Tichnell,* 306 Md. 428, 466, 509 A.2d 1179, 1199 (1986) (*Tichnell IV*). But when the threshold element of a first degree murder has been established by the guilt/innocence phase jury, this in no way usurps the function of the sentencing jury. The State must still present evidence and prove, beyond a reasonable doubt, that the murder was committed with one or more aggravating circumstances.

■ Hunt also contends that "[s]ince the language of the sentencing form assumes that first degree premeditated murder has already been found, the new jurors are unable to decide the issue of premeditation." The short answer to Hunt's contention is that he is in error legally as well as factually. First, the sentencing form did not state or imply that the first degree murder was committed with premeditation or deliberation. Second, there is no "issue of premeditation" that a sentencing jury must decide before imposing a sentence of death. To be eligible for the death penalty, the defendant must have committed a first degree murder; it need not be a premeditated, deliberate first degree murder. *Harris v. State,* 303 Md. 685, 711–12, 496 A.2d 1074, 1087 (1985); *Stebbing v. State,* 299 Md. 331, 358–61, 473 A.2d 903, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). Third, Hunt has no basis to complain since he received as much as, if not more than, he was entitled to when the judge instructed the sentencing jury that it might consider the absence of premeditation or deliberation to be a mitigating circumstance.

Finally, the Supreme Court has made it clear that a defendant has no federal constitutional right to have a sentencing jury reconsider the question of guilt or "residual doubt" about guilt in the penalty phase of a capital sentencing proceeding. *Franklin v. Lynaugh,* 487 U.S. at 173, 108 S.Ct. at 2327, 101 L.Ed.2d at 165.

## XIV. HUNT'S REQUEST TO "BIFURCATE" THE SENTENCING PROCEEDING

■ Hunt contends that his sentencing proceeding should have been "bifurcated." He argues that the jury

should have first deliberated on and decided the existence of aggravating factors before he put on any evidence in support of mitigating factors.

We find no support in law and little support in logic for Hunt's contention. The basis for his argument seems to be that in a sentencing proceeding the defendant must often make a choice between either attacking the nature of the crime and the State's proof of aggravating factors, or demonstrating remorse. Hunt offers no clear explanation as to why such a choice was required or how bifurcation would alleviate his dilemma. Hunt also suggests, without any citation of authority, that absent bifurcation the sentencing procedure confused the jury and was unconstitutional.

The purpose of a death sentence proceeding is to " 'point to the main circumstances of aggravation and of mitigation that should be weighed *and weighed against each other* when they are presented in a concrete case.' " *Gregg v. Georgia,* 428 U.S. 153, 193, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859, 886 (quoting Model Penal Code § 201.6, comment 3 at 71 (Tent. Draft No. 9, 1959)) (plurality opinion), *stay granted,* 429 U.S. 1301, 96 S.Ct. 3235, 50 L.Ed.2d 30, *order vacated,* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). (Emphasis in original). The balancing of aggravating and mitigating factors is central to the jury's duty. It would seem that aggravating and mitigating circumstances can be best weighed "against each other" when the jury has the opportunity to ascertain them and weigh them at the same hearing. There is no reason to conclude that the jury was somehow misled or confused because the sentencing proceeding was not bifurcated.

To support his argument for "bifurcation" Hunt cites *Treece v. State,* 313 Md. 665, 547 A.2d 1054 (1988). In *Treece,* this Court noted that in appropriate circumstances, where the defendant has plead not criminally responsible by reason of insanity, the guilt or innocence stage of the trial should be bifurcated from the hearing to determine whether the defendant lacked criminal responsibility. A defendant's

guilt or innocence is a determination completely separate from that of criminal responsibility. The bifurcation involved in *Treece* is more analogous to the bifurcation Hunt received when the issue of his guilt or innocence was determined in one proceeding and his sentence in another. *Treece* does not require or even suggest the "trifurcation" that Hunt seeks.

## XV. PROPORTIONALITY REVIEW

■■ Hunt does not raise the issue, but we are required by Art. 27, § 414(e) to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. We conclude that the death penalty is neither excessive nor disproportionate when imposed on Hunt for this brutal murder of a police officer committed during an attempt to resist a lawful arrest. *See Tichnell v. State,* 297 Md. 432, 467, 468 A.2d 1, 19 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (*Tichnell III*), where we noted that the murder of a police officer in the performance of his duty has long been found as an "especially grievous crime," and that "[s]uch a killing constitutes an assault on society itself...."

JUDGMENT AFFIRMED.